El Juez Asociado Sr. Sifre no intervino.

EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CATALINO SÁNCHEZ MALDONADO, acusado y apelante.

Número 13047.

*Sometido:* 1 de marzo de 1956. *Resuelto:* 3 de abril de 1956.

---

*Arcilio Alvarado,* abogado del apelante; *Hon. Secretario de Justicia José Trías Monge, y Rafael L. Ydrach Yordán y Ramón C. Ruiz Sánchez, Fiscal y Fiscal Auxiliar, respectivamente, del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

Después de haber sido convicto por un jurado de los delitos de asesinato en primer grado y asesinato en segundo grado, el apelante Catalino Sánchez Maldonado fué sentenciado a reclusión perpetua en el primero y a cumplir de diez a doce años de presidio en el segundo. Contra esas sentencias interpuso el presente recurso señalando dos errores, a saber: (1) los veredictos fueron contrarios a la prueba, y (2) el tribunal erró al no conceder un nuevo juicio.

Al discutir el primer error el apelante no ataca la suficiencia de la prueba de cargo y conviene en que la misma establece prima facie los dos delitos de asesinato. Su contención concreta es que el jurado apreció erróneamente la prueba sobre su incapacidad mental.

Antes de entrar a considerar esta cuestión es conveniente hacer un resumen de la prueba de cargo. Ésta demostró que en la noche del 16 de enero de 1951 fueron sorprendidas varias reses del acusado-apelante Catalino Sánchez Maldo-

ñado haciendo daños en los terrenos de la Universidad de Puerto Rico. Apresadas dichas reses, el guardián de la Universidad, Aurelio Ramos López acompañado de Luis Alberto Cruz Santiago y del joven Flor Ortiz Dones, se dirigieron a pie hacia la cárcel municipal de Río Piedras llevando por delante las susodichas reses. Cuando iban por la avenida Muñoz Marín, en dirección de Río Piedras hacia Caguas, se acercó a ellos un vehículo de motor conducido por el apelante. Éste lanzó el vehículo contra Aurelio Ramos López, que era el que caminaba más al centro de la carretera, arrollándolo y produciéndole lesiones que le causaron la muerte. El apelante detuvo la marcha de su vehículo, se bajó de éste con un tubo en sus manos y asestó varios golpes a Luis Alberto Cruz quien en esos momentos trataba de auxiliar a Aurelio Ramos. Cruz falleció también a consecuencia de los golpes que le propinara el apelante. El otro muchacho huyó para evitar ser agredido. Instantes después el apelante fué arrestado por el policía Rafael Meliá León quien pasaba en su automóvil por esa carretera y al ver a un hombre con un tubo en la mano derecha tratando de detener los vehículos que por allí transitaban detuvo el suyo y le preguntó que le pasaba, a lo que aquél contestó "que maté dos personas y me quiero entregar". Entonces le pidió al policía que lo llevara al Cuartel de la Policía de Hato Rey porque en Río Piedras podían matarlo. El policía lo montó en su automóvil y lo condujo al Cuartel de Hato Rey. En el trayecto el apelante manifestó al policía "Maté esos dos sinvergüenzas, no abusarán más conmigo, se terminó el abuso conmigo". Ya en el cuartel el apelante declaró bajo juramento por escrito que esa noche estando acostado en su casa fué un muchacho a decirle que le llevaban sus vacas para la cárcel y que entonces él se levantó, montó en su guagua y se fué en persecución de las vacas; que al ver las reses en la carretera y a tres individuos llevándolas se puso nervioso, aceleró la marcha y le tiró la guagua encima a Leyo [Aurelio Ramos

López] y luego se bajó de la guagua y le dió dos tubazos por la cabeza y otro por el brazo a Gilberto (sic) cuando éste vino a auxiliar a Leyo.

Terminada la presentación de la prueba de cargo el abogado defensor anunció que "la evidencia del acusado en este caso va a tratar de demostrar la teoría de la irresponsabilidad criminal por parte del acusado por no tener el dominio de sus facultades mentales." La evidencia que a este efecto presentó tendía a demostrar que el acusado padecía de demencia precoz o esquizofrenia de origen hereditario. En su alegato el apelante agrupa la prueba presentada por él en estas cuatro categorías: (1) tara; (2) actos específicos del acusado reveladores de su incapacidad mental; (3) prueba técnica de perito médico, y (4) forma en que ocurrieron los hechos. Su contención es que esa prueba no fué contradicha; que el jurado no tuvo ante sí un conflicto de prueba; que no hubo base alguna para no darle crédito a la prueba de defensa, y que los veredictos eran manifiestamente erróneos.

A nuestro juicio no tiene razón. La prueba sobre la tara hereditaria del acusado estableció que tres de sus hermanos habían estado recluídos en el Manicomio, dos de ellos padeciendo de esquizofrenia y otro de oligofrenia; que tres tíos por parte de padre habían cometido suicidio y que el propio padre del acusado también había intentado suicidarse. Es cierto que esta prueba no fué contradicha. Sin embargo, prueba de esta naturaleza se admite al solo efecto de corroborar otras pruebas directas sobre la sanidad mental del acusado pero por sí sola no prueba la locura del acusado. *Commonwealth* v. *Dale*, 107 Atl. 743; *People* v. *Gambacorta*, 90 N.E. 809; *Guiteau's Case*, 10 Fed. 161; *State* v. *Moore*, 76 P.2d 19; *People* v. *Kohlmeyer*, 31 N.E.2d 490; 1 Wharton's *Criminal Law*, 12th. ed., sec. 83, pág. 124; 2 Wigmore *On Evidence*, 3ra. ed., sec. 232, pág. 22; 28 Am. Jur., sec. 133, pág. 760.

■■ En cuanto a la conducta del acusado antes y después de la comisión de los delitos su prueba tendió a demostrar que en ocasiones había realizado actos específicos de extravagancia, tales como hablar solo, llorar sin motivo, abandonar inesperadamente sus labores, morder el hocico de una vaca porque ésta le azotara con el rabo; echar a correr sin razón aparente para ello; agredir a los amigos por cualquier discusión y haber realizado intentos de suicidio. La propia esposa del acusado declaró sin embargo, que éste tenía temporada de meses que estaba bien.

Estos hechos tampoco prueban que el acusado estaba loco en el momento de cometer los delitos. La locura del acusado en el momento de cometer el hecho delictivo es lo que le exime de responsabilidad criminal. *Pueblo* v. *Alsina*, ante pág. 46; 1 Wharton's *Criminal Evidence*, sec. 318, pág. 428; Werhofen, *Mental Disorder as a Criminal Defense*, págs. 52 y 323.

■■ La defensa también presentó el testimonio de un perito médico quien declaró que después de haber hecho un examen de dos horas al acusado mientras éste estaba recluído en la cárcel y luego de estudiar su tara hereditaria y de conocer los actos específicos de extravagancia que habían sido relatados por los testigos de defensa, había llegado a la conclusión de que dicho acusado era un loco que padecía de demencia precoz y que no podía distinguir entre el bien y el mal en el momento de cometer los delitos que se le imputaban. Para impugnar el testimonio de este perito el fiscal presentó en *rebuttal* la declaración de otro perito médico especializado en siquiatría, el doctor Ramón Señeriz, quien declaró que para poder determinar científicamente si una persona padece de sus facultades mentales es necesario que el siquiatra haga al paciente un examen en la siguiente forma: observación del paciente por un período no menor de treinta días excepto que en aquellos casos en que desde la niñez se han presentado síntomas de locura bastará con 3, 4, 5 entrevistas; estudio del historial de la vida del individuo y el de

sus antepasados; examen físico completo del paciente para determinar si ha habido alguna lesión orgánica; exámenes de laboratorio, tales como examen del líquido céfalo raquídeo y estudio encefalográfico; observación del paciente en distintas y determinadas circunstancias, y por último, exámenes mentales periódicamente. Declaró además este perito que el hecho de que una persona intente suicidarse no es suficiente para concluir que esa persona está loca.

No tenemos duda de que la declaración del perito presentada por el fiscal ataca la credibilidad del perito presentado por la defensa. Correspondía por tanto al jurado determinar a cuál de los dos testimonios iba a dar crédito. En varias ocasiones hemos dicho que la opinión de un perito no es obligatoria para los juzgadores y que un tribunal al apreciar la prueba pericial no está obligado a aceptar las conclusiones de un perito. *Pueblo v. Dones*, 56 D.P.R. 211; *Pueblo v. Bonelli*, 19 D.P.R. 69; *Pueblo v. Sutton*, 17 D.P.R. 345.

■■ Además, de la prueba de cargo surgen circunstancias que el jurado pudo considerar en relación con la controversia sobre la sanidad mental del acusado-apelante. Su conducta inmediatamente antes y después de cometidos los delitos proporcionaba una base razonable para inferir su sano juicio.(¹) Por ejemplo, los crímenes por él cometidos no están desprovistos de un móvil. Sus manifestaciones al policía en el sentido de que había matado a esos dos sinverguenzas y que ya no abusarían más de él denota su deseo de vengarse de las personas que llevaban sus reses para la cárcel. Su solicitud al policía para que lo llevara al Cuartel de Hato Rey porque en Río Piedras podían matarlo es la actitud normal de una persona que teme ser objeto de represalias por los actos que acaba de cometer y procura protección para su persona y su vida. Más aún, el fiscal Dueño declaró que el

---

(¹) En cuanto a la pertinencia de la evidencia sobre los actos, condiciones y conducta del acusado, antes y después de cometer el delito, véase, entre otras autoridades, a 1 Wharton's *Criminal Evidence*, pág. 423, sec. 318; Werhofen, ob. cit., pág. 312.

acusado se encontraba tranquilo y sereno en el Cuartel de la Policía de Hato Rey; que contestaba correctamente todas las preguntas que se le hacían y que no notó incoherencia alguna en sus declaraciones, al extremo que dicho fiscal nunca tuvo dudas de su sanidad mental.

La locura como defensa en un proceso criminal es una cuestión de hecho para ser resuelta por el jurado a base de la evidencia presentada y bajo instrucciones adecuadas de la corte. *Fisher* v. *Fraser*, 233 P.2d 1066; *State* v. *Moore*, supra; *Stevens* v. *State*, 99 Am. Dec. 634; *Ryan* v. *People*, 153 Pac. 756; *State* v. *Brown*, 102 Pac. 641; *People* v. *Scott*, 88 N.E. 35; *State* v. *Keerl*, 75 Pac. 362; 2 Wharton's *Criminal Evidence*, sec. 894, pág. 1542. Considerando toda la prueba presentada en este caso, el jurado podía resolver, como en efecto lo hizo, que el acusado-apelante no estaba loco en el momento de cometer los delitos imputádosle for el fiscal. En su consecuencia, los veredictos condenatorios no son erróneos. El primer error no fué cometido.

En el segundo señalamiento se ataca la resolución denegatoria de un nuevo juicio. En vista de que el acusado no apeló de dicha resolución, no podemos considerar el error señalado. *Pueblo* v. *Millán*, 66 D.P.R. 243; *Rodríguez* v. *Pueblo*, 75 D.P.R. 401; *Pueblo* v. *Busigó*, 78 D.P.R. 162.

*Las sentencias apeladas serán confirmadas.*

El Juez Asociado Sr. Belaval concurre con los resultados.

