ELENA DÍAZ GARCÍA, demandante y recurrente, *v.* FRANCISCO APONTE APONTE y su esposa CRUZ NOELIA RIVERA, ETC., demandados y recurridos.

*Número:* RE-88-101 *Resuelto:* 15 de diciembre de 1989

*Manuel Z. González Hernández*, abogado de la recurrente; *Raúl Aponte Sánchez*, abogado de Francisco Aponte Aponte, recurrido; *Ángel Lacomba Morales*, abogado de Cruz Noelia Rivera, recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 18 de enero de 1982 Gonzalo Díaz Aponte ingresó en la Clínica Oriente de Humacao con un diagnóstico de cáncer terminal en el páncreas. El 9 de febrero, en el mismo hospital, otorgó ante el notario Ángel Figueroa Peña una escritura de compraventa en la que se elevó a escritura pública un contrato *verbal* de venta, a su sobrino Francisco Aponte Aponte y a su esposa Cruz Noelia Rivera Valentín, en *1975*, de una finca de 44.85 cuerdas. La escritura consignó, como precio pactado, $90,000, de los cuales admitió haber recibido $70,000 con *anterioridad* a la fecha del otorgamiento. A esos fines, los compradores presentaron al notario siete (7) recibos de pago —debidamente firmados por Díaz Aponte— cada uno por la suma de $10,000 con fechas correspondientes a *1975*, 1976, 1977, 1978, 1979, 1980, 1981. A su vez, otorgaron pagaré al portador por el remanente de $20,000. Dos (2) días más tarde, Díaz Aponte otorgó otra escritura, esta vez

ante la notario Aida Luz Moringlane Ruiz, mediante la cual vendía dos (2) fincas a Miguel Maldonado García y a su esposa Margarita Pintor Báez. Esta venta se llevó a cabo por la suma de $37,000, de los cuales Díaz Aponte recibió $13,000 con anterioridad a la firma de la escritura. Sobre el remanente de $24,000 los compradores constituyeron pagaré hipotecario al portador. *Pocos días después, el 21 de febrero, Díaz Aponte falleció ab intestato.*

Así las cosas, el 28 de junio de 1982, Elena Díaz García presentó en el Tribunal Superior, Sala de Humacao, demanda contra Aponte Aponte, su esposa Rivera Valentín, su sociedad de gananciales y John Doe, como tenedor no identificado del supuesto pagaré de $20,000. Dicha promovente era hija de Díaz Aponte por decreto judicial. Su padre nunca la reconoció voluntariamente. Ella logró establecer su filiación mediante sentencia final y firme en el caso Civil Núm. 74-1224 ante el Tribunal Superior, Sala de Humacao, de cuyos autos tomamos conocimiento judicial. Díaz Aponte fue representado en dicho pleito por su otro sobrino, el Lcdo. Luis Aponte Aponte.

Ambos eran los posibles herederos de no haber prevalecido en el caso de filiación pues, aparte de ella, no existía ningún otro heredero forzoso.

Solicitó la nulidad de la compraventa efectuada entre su padre y los esposos Aponte-Rivera. Alegó que la misma fue fraudulenta y realizada con el único propósito de privarle de sus derechos hereditarios. Adujo que la escritura autorizada por el licenciado Figueroa Peña fue simulada y antedatada. También, que durante la hospitalización de su padre, Aponte Aponte retiró del Oriental Federal Savings Bank, el 4, 11, 12 y 16 de febrero, las cantidades siguientes: $500; $8,000; $6,800; $3,500; $5,000, y $4,945.

Los demandados esposos Aponte-Rivera negaron tales alegaciones. Formularon reconvención fundada en que Díaz

García estaba detentando la propiedad objeto de la controversia sin pagar canon alguno.

La vista del caso se celebró en sus méritos. La prueba de la demandante Díaz García consistió esencialmente de los testimonios del licenciado Figueroa Peña, de la licenciada Moringlane Ruiz y del perito calígrafo Saúl Rivera Alicea. El notario Figueroa Peña declaró que Díaz Aponte le visitó en septiembre de 1981 para expresarle su interés de elevar a escritura pública un negocio efectuado con Aponte Aponte años atrás y, a tales efectos, comenzó a preparar la escritura en enero de 1982.(1) En cuanto a los siete (7) recibos de pago, atestó que le fueron entregados por Aponte Aponte en la mañana del 9 de febrero y que los mostró a Díaz Aponte, quien aceptó que todos estaban firmados por él. T.E., pág. 16. Declaró, además, que Díaz Aponte le comunicó que existía una deuda por $20,000 y que no constituyó una hipoteca porque éste le informó que no era necesario.

Posteriormente, la licenciada Moringlane Ruiz, entre otros extremos, declaró que el 11 de febrero —luego de terminar el acto de otorgamiento de la escritura— Aponte Aponte la llamó aparte y le pidió que le redactara una escritura de compraventa mediante la cual él le compraba a Díaz Aponte la finca de cuarenta y cinco (45) cuerdas. Ella se negó a hacerlo. Al día siguiente volvió a insistir y hasta le ofreció una suma de dinero sustancial. Al ella reiterar su negativa,

---

(1) Copias de los índices notariales del licenciado Figueroa Peña —correspondientes a las semanas del 7 al 13 y del 14 al 20 de febrero— fueron presentadas y admitidas en evidencia para demostrar la posibilidad de que la escritura hubiese sido antedatada.

Ello es así, ya que entre el 4 y el 18 de febrero el notario Figueroa Peña no autorizó escritura alguna —salvo la que se impugna— y desde el 9 hasta el 16 de febrero tampoco autorizó ningún afidávit.

La fiel solución del recurso no exige pronunciamiento al respecto.

Aponte Aponte le informó que buscaría un amigo que la autorizara. T.E., págs. 48–52.[2]

Por su parte, el perito Rivera Alicea declaró que luego de un análisis pudo determinar que la firma de Díaz Aponte que aparecía en cada uno de los siete (7) recibos era genuina, *pero que la misma estaba fuera de tiempo en relación con las fechas de los documentos.* Es decir, que las firmas, aunque genuinas, no correspondían a la fecha consignada en el recibo. T.E., pág. 126. Para llevar a cabo su análisis, utilizó el método comparativo de diversos documentos fotocopiados que contenían la firma de Díaz Aponte en distintos años, tales como sus planillas de contribución sobre ingresos, tarjetas de cuentas bancarias y una declaración jurada.

Ante esa prueba, los demandados Aponte-Rivera solicitaron la desestimación del caso. Argumentaron que, según los hechos hasta ese momento probados, la demandante Díaz García no tenía derecho a remedio alguno. El foro de instancia (Hon. Carlos De Jesús Rivera Marrero, Juez), antes de resolver, le brindó a la demandante Díaz García la oportunidad de presentar prueba en cuanto a las alegaciones de la reclamación sobre los retiros de dinero de las cuentas bancarias. Al ella indicar que había desfilado toda su prueba, el tribunal desestimó todas sus reclamaciones, excepto la del pagaré de $20,000. T.E., pág. 379. Los demandados desistieron de su reconvención. En consecuencia, el tribunal condenó a los demandados al pago de $20,000, más intereses al diez por ciento (10%) desde el 9 de febrero de 1982 hasta la fecha en que se efectúe el saldo total de dicha obligación. Determinó que la demandante Díaz García fue temeraria en la tramitación del pleito —excepto la reclamación por los

---

[2] El testimonio de la licenciada Moringlane Ruiz fue objetado en múltiples ocasiones por el fundamento de ser inadmisible como prueba de referencia. En particular, cuando atestó que Díaz Aponte le había indicado el 11 de febrero que la finca de cuarenta y cinco (45) cuerdas no estaba incluida en la compraventa que iba a efectuarse.

$20,000— por lo que la condenó al pago de las costas, gastos y $1,500 en honorarios de abogado a cada uno de los codemandados.

Con vista a una moción de reconsideración y solicitud sobre determinaciones de hecho adicionales, dicho foro corrigió algunos errores que se le señalaron y reiteró su dictamen.

Inconforme, a solicitud de Díaz García, revisamos.

## II

La justa solución del recurso obliga a una breve incursión en las doctrinas del contrato simulado y de causa ilícita. Emprendámosla.

La simulación ha sido definida como "el acto o negocio jurídico que por acuerdo de las partes se celebra exteriorizando una declaración recepticia no verdadera para engañar a terceros, sea que ésta carezca de todo contenido, o bien que esconda uno verdadero diferente al declarado". S. Cifuentes, *Negocio Jurídico: Estructura, Vicios, Nulidades*, Buenos Aires, Ed. Astrea, 1986, pág. 502. Véanse, además: L. Muñoz Sabaté, *La Prueba de la Simulación*, 2da ed., Colombia, Ed. Temis, 1980, pág. 116; L. Cariota Ferrara, *El Negocio Jurídico* (M. Albaladejo, traductor), Madrid, Ed. Aguilar, 1956, págs. 440–441; F. Ferrara, *La simulación de los negocios jurídicos* (R. Atard y J.A. De la Puente, traductores), 3ra ed., Madrid, Ed. Rev. Der. Privado, 1953, pág. 44; R. Díez Duarte, *La simulación de contrato en el Código Civil chileno*, 2da ed., Chile, Ed. Fallos Del Mes, 1982, págs. 60–64; E. Paillas, *La Simulación: Doctrina y Jurisprudencia*, 2da ed., Chile, Ed. Jurídica de Chile, 1981, pág. 9; F. De Castro y Bravo, *El Negocio Jurídico*, Madrid, Ed. Inst. Nac. Est. Jur., 1967, pág. 338.

Históricamente el concepto "simulación" fue considerado como una vertiente de la teoría general del fraude.

Ello se debió, principalmente, al hecho de que en la mayoría de las veces el negocio simulatorio servía de medio para perpetrar un fraude. Sin embargo, al presente la doctrina ha delimitado perfectamente así sus contornos:

> Fraude y simulación constituyen dos conceptos diferentes. Incluso cuando la simulación es empleada para fines ilícitos, como perjudicar a los acreedores, ocultar la violación de infracciones legales, etcétera, no cabe hablar de fraude. El negocio simulado y el negocio fraudulento, como veremos a continuación, han de ser diferenciados, pues si con el negocio simulado se persigue defraudar los derechos de un tercero o violar la ley, nos encontraremos ante una simulación ilícita pero no ante un negocio fraudulento. M. Cárcaba Fernández, *La simulación en los negocios jurídicos*, Barcelona, Librería Bosch, 1986, pág. 58.

En igual sentido, Cariota Ferrara nos dice:

> ... la simulación solamente es simulación y no se deja calificar, y el fraude puede ser sólo el fin concreto que induce a simular y que se encuentra fuera de la simulación. Por lo demás, el negocio simulado, en cuanto no es querido en su contenido ni en su resultado, no puede realizar el fraude, sino sólo servir de instrumento con el que crear aquella situación aparente que, engañando a los terceros, lo hace prácticamente posible. (Escolios omitidos.) Cariota Ferrara, *op. cit.*, pág. 443.

Observamos, pues, que el *fraude* realmente adquiere categoría autónoma cuando consiste en un negocio *real,* no ficticio, dirigido a perjudicar a terceros. Por el contrario, en el supuesto de una compraventa simulada cuya intención es perjudicar a los acreedores o herederos de uno de los contratantes —haciéndoles creer que el activo de su deudor es menor del que realmente es o tratando de beneficiar a un heredero en perjuicio de los demás— *el negocio simulado es falso.*

Nuestro ordenamiento jurídico distingue entre la simulación *relativa* y *absoluta.* La distinción es importante

por las consecuencias jurídicas que acarrea. Veamos. La simulación *relativa* tiene lugar cuando bajo la falsa apariencia se encubre un negocio realmente querido que los contratantes desean sustraer de la curiosidad e indiscreción de terceros. El caso típico de este tipo de simulación —cuya validez examinamos en *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9 (1982)— es la compraventa con una donación subyacente. En este tipo de casos, hemos provisto para que, cumplidos unos requisitos, el contrato simulado quede eliminado y cobre vigencia el verdadero y disimulado.

▮ Por su parte, la simulación *absoluta* se produce cuando el acto jurídico nada tiene de real y meramente crea la apariencia de un negocio. En ésta, el contrato —por carecer de causa— es nulo, inexistente y no produce efectos jurídicos. *Reyes v. Jusino*, 116 D.P.R. 275 (1985); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985); *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13 (1962).

### III

▮ Nuestro Código Civil presume que todo contrato tiene causa y que ésta es lícita. No obstante, esta presunción puede ser destruida. Al respecto, hemos resuelto que *se entenderá que no medió precio ni su equivalente cuando en la escritura pública el notario no da fe de su entrega, o si confesando los contratantes haberse éste verificado con anterioridad, no se justificare el hecho. Ledesma Marrero v. Ledesma Marrero*, 84 D.P.R. 167 (1961). Y es que en el otorgamiento de una escritura de compraventa el pago del precio no debe dejar lugar a dudas. No es "suficiente la confesión de haberlo recibido, o que en la escritura conste su existencia, pues en ocasiones se finge ante el Notario una entrega que no es más que una farsa de los simulantes para engañarle". Cárcaba Fernández, *op. cit.*, pág. 138. Esta exigencia responde a la necesidad de que el precio ineludiblemente exista,

de lo contrario la venta sería simulada. J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. X, Vol. 1, pág. 77 y ss.; J. Castán Tobeñas, *Derecho civil español, común y foral*, 11ma ed. rev., Madrid, Ed. Reus, 1981, T. IV, pág. 87 y ss.; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 323 y ss.; J. Santos Briz, *Derecho Civil: Teoría y Práctica*, Madrid, Ed. Rev. Der. Privado, 1973, T. IV, pág. 57 y ss.

■ Por otro lado, cabe señalar que la celebración de un negocio jurídico puede levantar serias sospechas —sin perjuicio de otros indicios concurrentes— por el tiempo o momento de su celebración. "En los supuestos de liberalidades encubiertas —retornando al análisis del indicio 'tempus'— tiene gran significación la proximidad de las mismas con la muerte del donante." J. Mosset Iturraspe, *Negocios Simulados, Fraudulentos y Fiduciarios*, Argentina, Ed. Ediar, 1974, T. I, pág. 291. Véase, además, Muñoz Sabaté, *op. cit.*, pág. 348.

## IV

■ Por sus características peculiares y de ordinario surgir de un trasfondo de hechos ocultos —psíquicos y generalmente ilícitos— la simulación ha sido tradicionalmente considerada como materia *difficilioris probationes*.

En pocas materias como en la simulación adquiere tan primordial importancia el estudio de la prueba, ya que, como resultado de la imagen de veracidad creada con el negocio aparente y de la diligencia con que actúan las partes simulantes, ocultando el acuerdo simulatorio y procurándose coartadas que afiancen la credibilidad de aquélla, para restablecer la justicia *es preciso proporcionar a los terceros ajenos a la simulación un amplio abanico de medios probatorios, admitiéndose con un valor inusual la prueba de presunciones, en base a la cual, como veremos en breve, se puede llegar a evi-*

*denciar la ficción de un negocio, incluso aunque conste en documento público.* (Énfasis suplido.) Cárcaba Fernández, *op. cit.*, pág. 119.

Por tal razón, se reconoce que para probar la existencia de un acto simulado cobran valor excepcional los medios probatorios indirectos, a saber, los testigos y las presunciones. A través de éstos, el juzgador puede llegar a determinar, con certeza razonable, la ocurrencia de la simulación. Díez Duarte, *op. cit.*, págs. 187–188; Cifuentes, *op. cit.*, págs. 533–534. A tal efecto, hemos resuelto que cuando la alegada simulación afecta la *causa* del contrato, el *demandante debe probar que no medió precio ni su equivalente, o que bajo la causa falsa subyace otra verdadera y lícita que hace válido el negocio.* "Conviene precisar a tales efectos el alcance de la simulación cuando se expresa una causa falsa en los contratos. Primero, la simulación por sí misma no hace ilícito o nulo el negocio. Segundo, no obstante, se cierne sobre el negocio una mácula de sospecha. Tercero, una vez descubierta la simulación pierde vigencia la presunción de que la misma es lícita, y ya no recae sobre el deudor la carga de probar su existencia. Cuarto, se ha creado una presunción de simulación absoluta contra el negocio disimulado que compete al gestor rebatir mediante la existencia de una causa verdadera y lícita." *Reyes v. Jusino,* supra, pág. 284.

## V

Bajo el crisol de este marco doctrinario, procede revocar. Concluimos que la prueba de la demandante Díaz García destruyó la presunción de existencia de causa en el negocio jurídico entre su causante Díaz Aponte y los esposos Aponte-Rivera. Estableció prima facie un caso de simulación en el otorgamiento de la escritura de 9 de febrero de 1982.

Así surge del testimonio de la licenciada Moringlane Ruiz, el perito Rivera Alicea y prueba documental. En

cuanto a la primera, valga recordar que en este tipo de casos son testigos idóneos "aquellas personas a quienes el simulador solicitó primitivamente su complicidad en la simulación y que por razones de moralidad, miedo, económicas o lo que fuere, se la negaron". Mosset Iturraspe, *op. cit.*, pág. 266. Igualmente, se imponía un análisis más detenido de las circunstancias relacionadas al tiempo o momento del otorgamiento de la escritura. Como expusimos, este factor es considerado vital por la doctrina, como uno de los principales indicadores demostrativos de un cuadro de simulación negocial.

En el caso que nos ocupa, la escritura en controversia se otorgó en el hospital, bajo circunstancias sospechosas, sólo doce (12) días antes de la predecible e inevitable muerte de Díaz Aponte. Frente a ello, habían transcurrido siete (7) años desde que supuestamente se había realizado la compraventa. Curiosamente, la demanda de filiación fue presentada por Díaz García para mayo de 1974, *un (1) año antes de que se realizara "verbalmente" la compraventa*. El decreto filiatorio favorable a la demandante fue dictado el 15 de agosto de 1977. Estos detalles hacen que se cierna sobre el negocio una fuerte mácula de sospecha. El juzgador de instancia debió abstenerse de desestimar la demanda.

 Este caso ilustra la necesidad de escrutar cuidadosamente la evidencia pericial. Como Foro apelativo no estamos obligados "a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo . . .". *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594, 623 (1970). Estamos en libertad para adoptar nuestro criterio. *Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488, 495 (1965); *Pereira v. E.L.A.*, 91 D.P.R. 750, 753 (1965); *Estado Libre v. Bravo*, 79 D.P.R. 779, 786 (1956); *Pueblo v. Sánchez*, 79 D.P.R. 116, 121 (1956). Reiteramos esa norma y la que propugna que estamos en igual situación que los foros de instancia para evaluar prueba documental. *Ramírez, Segal & Láti-*

*mer v. Rojo Rigual*, 123 D.P.R. 161 (1989); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 D.P.R. 527 (1981).

Sobre el particular, el examen de cada uno de los siete (7) recibos de pago sugiere que: (1) *todos* proceden de una misma libreta; (2) fueron escritos con la *misma maquinilla*, y (3) con toda probabilidad *el mismo día*. La similitud de las marcas de desteñido en la superficie y en sus bordes, al igual que las letras de la maquinilla utilizada para escribirlos, es palpable a simple vista.

Estas circunstancias tienden a sostener el testimonio del perito de la demandante Díaz García de que las firmas en los recibos están "fuera de tiempo". Es decir, que aun cuando la firma es genuina, ésta no corresponde a la de Díaz Aponte para los años en éstos consignados. Evidentemente todos los recibos fueron signados por Díaz Aponte en *1982*. Por lo tanto, dichos recibos —carentes de valor— no podían ser utilizados para justificar, ante el notario Figueroa Peña, el hecho de haberse verificado la entrega del precio *con anterioridad* a la fecha del otorgamiento. Como expusiéramos previamente, *en tales circunstancias se entenderá que no medió precio ni su equivalente y la presunción de causa en el negocio jurídico queda destruida.*

En resumen, la prueba de la demandante recurrente Díaz García fue más que suficiente para destruir la presunción de existencia de causa en el negocio jurídico y establecer un caso prima facie de simulación. Las circunstancias en que fue otorgada la escritura y los indicadores objetivos aludidos tienden a reflejar la simulación del negocio con el propósito de privarla de sus derechos hereditarios. Corresponde ahora a los demandados Aponte-Rivera presentar su prueba y demostrar la existencia de causa, incluso una donación subyacente conforme y con sujeción a nuestra doctrina vigente.

Por los fundamentos antes expuestos, *se dictará sentencia revocatoria y se devolverá el caso al Tribunal Superior, Sala de Humacao, para procedimientos ulteriores compatibles con lo aquí resuelto.*