TEXTO COMPLETO DE LA SENTENCIA
La parte apelante, Félix Ortiz Andino y otros (en adelante, Ortiz Andino) recurren contra sentencia *1167 emitida por el Tribunal de Instancia, Sala Superior de Arecibo, Hon. German Brau (Juez), en la cual se determinó desestimar la demanda incoada al entender que el tratamiento médico provisto por las partes demandadas, Caribbean Hospital Corp. y otros (Caribbean), no había sido la causa de la muerte de José Ortiz González.
Tras un largo proceso para lograr el perfeccionamiento del extenso recurso, se logró finalmente la aprobación de la exposición narrativa de la prueba oral, la cual fue traída a nuestra atención el 5 de septiembre de 1997. El 3 de noviembre de 1997 Ortiz Andino presentó su articulado alegato suplementario. El 18 de diciembre de 1997, una de las co-demandadas, el Estado Libre Asociado de Puerto Rico, presentó su alegato en oposición. Ninguno de los otros co-demandados ha comparecido.
El 8 de julio de 1987 se presentó demanda en daños y perjuicios por mala práctica de la medicina, por la muerte de José Ortiz González, quien falleció el 18 de julio de 1986 mientras recibía atención médica en el Hospital Regional de Manatí, Hospital Alejandro Otero López (HAOL).
Conforme a los documentos ante nos el juicio en su fondo se extendió por nueve días, con el testimonio de un total de once testigos y con la presentación de extensa prueba documental. Los señalamientos de error en el recurso ante nos, se refieren a la apreciación de la prueba en cuanto a porciones del testimonio médico presentado. Tras comparar la exposición narrativa y los documentos ante nos, con las determinaciones de hechos de la sentencia, (enumeradas del 1 al 73) encontramos que la última, es sustancialmente correcta.
En apretada síntesis de los hechos que dan lugar a esta causa y de conformidad a la determinación de hechos efectuada en la sentencia y a los que surgen de la exposición narrativa y de los documentos ante nos, surge que durante el fin de semana del 4 de julio de 1986, el Sr. José Ortiz González de 46 años fue a un festival musical en San Juan. El Sr. Ortiz González padecía de sus facultades mentales desde hacía 18 años (esquizofrenia no diferenciada). Su condición era tratada con Thorazine 100 mgs., tres veces al día y con Prolixin intramuscular cada quince días. Además padecía de diabetes mellitus desde hacía 20 años, su hermano o su madre le inyectaban 20 unidades de insulina (NPH) diarias. Después del festival musical el Sr Ortiz González estuvo "perdido" y regresó a su casa en Manatí tres o cuatro días después. Al regresar, sus familiares notaron que estaba cojeando y que tenía una pequeña herida en el pie izquierdo.

"a. 11 de julio de 1986

1. Al continuar el dolor en el pie sus familiares lo llevaron al Centro de Diagnóstico y Tratamiento (C.D.T). de Manatí, el 11 de julio de 1986. Se determinó que tenía el azúcar alta, 500 mg/dl (los nives normales están entre los 80 y 140 mgl/dl) y que tenía un cuerpo extraño en el talón izquierdo. Debido a que en el C.D.T. no había insulina se le refirió al Hospital Regional de Manatí, Hospital Alejandro Otero López, a donde fue llevado en horas de la tarde del 11 de julio.

2. A las 4:40 p.m. de ese día sus signos vitales arrojaban una temperatura de 37°, pulso de 86, respiración de 20 y presión arterial de 140/100. De los exámenes de laboratorio efectuados ese día sólo se reflejaron niveles anormales de azúcar, 210 mg/dl. El residente que lo atendió inicialmente consultó con el Dr. Santiago, Cirujano del Hospital, sobre la condición del pie izquierdo.

b. 12 de julio de 1986

3. A las 4:20 a.m. del 12 de julio fue admitido al área de cirugía bajo el cuidado del Dr. Santiago, se determinó que el paciente estaba consciente, pero desorientado en las tres dimensiones y "[ajlucinando activamente". Se ordenó se le mantuviera solución salina, se le suministrara antibióticos intravenosos y Thorazine. Del expediente no surge que dicha orden haya sido cumplida ese día, ni que se le hubiera administrado insulina.

4.El paciente se removió el suero intravenoso posteriormente, se mostró desorientado, hiperactivo, caminando por los pasillos y sin seguir órdenes. Fue evaluado nuevamente en Emergencia donde le administraron dosis de Thorazine y lo acostaron en camilla con barandas elevadas y vigilado por el guardia de seguridad.

*1168
5. El Dr. Santiago evaluó al paciente ese mismo día como a las 4:24 p.m., juzgó que padecía de una fase aguda de esquizofrenia y decidió referirlo al Hospital Psiquiátrico del Centro Médico, debido a que estimaba que el paciente era agresivo y que no tenían en el hospital facilidades para tratar a este tipo de paciente sin riesgos para las enfermeras o para el propio paciente. Al ser referido no se había estabilizado la diabetes, ni se había atendido la lesión, tampoco se verificó la condición del paciente, ni se cercioraron si sería atendido en el Hospital Psiquiátrico por sus otras condiciones.

6. Debido a -que no contaban con suficientes ambulancias la orden de traslado firmada el 12 de julio de 1986 a las 4:24 p.m. no fue efectuada hasta el 13 de julio de 1986 a las 10:55 a.m. En el ínterin se le administró al Sr. Ortiz un tranquilizante.

c. 13 de julio de 1986

7. A las 12:45 a.m. del 13 de julio se logró canalizar la vena y se le administró por primera vez el antibiótico que se había ordenado administrar desde la madrugada del día anterior El paciente se removió posteriomente el suero, el cual se le pudo poner nuevamente a las 5:00 a.m., administrándole más antibióticos.

8. A las 8:10 a.m. del 13 de julio sus signos vitales eran: temperatura 36°, pulso 89, respiración 26 y presión alterial 140/90.

9. Al llegar al Hospital Psiquiátrico se le diagnosticó esquizofrenia crónica en su fase activa, se le refirió a la Sala de Emergencia del Hospital Universitario en el mismo Centro Médico para que recibiera tratamiento por sus otras condiciones, ya que reflejaba una úlcera en el talón del pie izquierdo, tenía temperatura de 39.9°C presión alterial de 170/100 y azúcar de 250. Se solicitó se evaluara la posibilidad de una cetoacidosis diabética y que se descarta la posibilidad de una sepsis.

10. Al llegar al Hospital Universitario el 13 de julio a las 2:53 p.m. se le administró por primera vez insulina. En el Centro Médico fue atendido por el Dr. Angel F. Laureano, especialista en Medicina Interna, quien observó en el paciente temperatura de 39 °C, pulso de 90, respiración de 20 y presión alterial de 200/100, encontró al paciente desorientado y agresivo. Observó celulitis en el pie izquierdo y una infección en el área.

11. Los laboratorios efectuados ese día como a las 5:15 p.m. reflejaron un alto nivel de glóbulos blancos, una pequeña cantidad de acetonas y un PH ácido. Se le trató con insulina, antibióticos, se le hidrató, se le colocaron catéteres subcláveos y sondas y se llevó a cabo tratamiento para cetoacidosis.

12. La úlcera en el pie izquierdo fue drenada y limpiada y se le administraron antibióticos. El paciente fue atendido en todo momento en la Sala de Emergencias debido a que no había camas en el hospital. A las 8:15 p.m. el Dr. Laureano lo volvió a examinar, concluyendo que el paciente respondió al tratamiento por la cetoacidosis debido a que el PH y Co2 estaba a niveles normales y la azúcar era de 150. El paciente continuó con tratamiento de hidratación, insulina y antibióticos.

13. El paciente fue transferido a psiquiatría, como a las 8:30 p m., posteriormente el Dr Laureano solicitó lo trajeran de vuelta a la Sala de Emergencias, lo que se hizo a las 10:00 p.m.

14. El Dr. Laureano se reunió con los familiares de Ortiz González más tarde en la noche y les expresó su preocupación de si el paciente recibiría la continuidad necesaria de tratamiento en la sala de emergencias, ya que no había camas disponibles una vez el terminara su turno. Les planteó la posibilidad de que lo trasladaran nuevamente al Hospital Regional de Manatí y que de así hacerlo sería en automóvil privado puesto que no existía ambulancias disponibles. Los familiares del Sr. Ortiz estuvieron de acuerdo con la sugerencia, firmaron un relevo de responsabilidad en la que se indicaba que la decisión de dar de alta al paciente estaba médicamente contraindicada.

d. 14 de julio de 1986

*1169
15. Ortiz González fue dado de alta el 13 de julio de 1986 a las 11:20 p.m. "contra la recomendación médica", los familiares llevaron al paciente a la Sala de Emergencias del Hospital de Manatí el 14 de julio de 1986 a la 1:38 a.m., tenía entonces temperatura de 40°C, pulso de 100, respiración de 28 y presión sanguínea de 130/90. Se observó ulceración en el talón izquierdo, por primera vez celutitis en el pie derecho.

16. A las 3:05 a.m. se le hicieron varias pruebas de laboratorio que reflejaron un contaje de glóbulos blancos de 10,100, azúcar de 107 md/dl. Se le mantuvo hidratado y con tratamiento de antibióticos.

17. Al percartarse de que el paciente había sido atendido por el Dr. Santiago, se sugirió se llamara a éste en la mañana. Tras varias gestiones infructuosas para intentar localizarlo, ya que éste se encontraba en Sala de Operaciones, éste sugirió se consultara el caso con ün médico de familia.

18.El paciente fue evaluado por un médico de familia temprano en la tarde y finalmente admitido el 14 de julio de 1986 a las 5:00 p.m. por orden del Dr. Martínez, médico del Departamento de Medicina de Familia.

19.Se le ordenaron varios exámenes de laboratorio que arrojaron un nivel de leucocitos de 20,000 y azúcar de 346, que a la medianoche bajó a 186. Continuaron administrándole antibióticos, insulina y solución salina. La sobrina del paciente firmó un consentimiento para su tratamiento, incluyendo "todos los procedimientos de diagnóstico y cuidado de hospitalización y todos los tratamientos quirúrgicos y/o de rayos X que sean necesarios"

e. 15 de julio de 1986

20. A las 6:00 a.m. del 15 de julio de 1986 el paciente reflejó nivel de azúcar de 297, prueba de acetona positiva, temperatura de 38°C, pulso de 100, respiración de 24 y presión arterial de 160/90.

21. A las 9:00 a.m. fue evaluado nuevamente por el Dr. Santiago quien concluyó se debía debridar la úlcera del talón izquierdo y drenar el absceso que se había desarrollado en el pie derecho, pautando una intervención quirúrgica para ese mismo día sin solicitar consentimiento específico para esa intervención y sin realizar una evaluación preoperatoria.

22. La operación se llevó a cabo a las 3:00 p.m. bajo anestesia general, la misma duró unos 10 minutos. Concluida la intervención, el Dr. Santiago no volvió a atender al Sr. Ortiz al entender que se trataba de una cirugía menor y que iba a estar al cuidado de otros médicos. De los documentos ante nos surge que la responsabilidad de un cirujano se circunscribe a la fase quirúrgica; sin embargo la buena práctica de la medicina no aconseja operar a un paciente y luego no volver a atenderlo.

23. Se continuó el tratamiento de antibióticos e insulina. Los laboratorios efectuados una hora después reflejaron acetona positiva y azúcar de 328.

24. A las 9:45 p.m. reflejó una temperatura de 40 °C administrándole aspirina para controlarla.

25. A las 12:00 de la media noche el Sr. Ortiz reflejaba azúcar de 428 mg/dl, temperatura de 40°C, pulso de 84, respiración de 21 y presión alterial de 170/90, se le continuó administrando insulina y antibióticos.

f. 16 de julio de 1986

26. El 16 de julio de 1986 el paciente permaneció igual con fiebre y azúcar alta, se le hizo placa de pecho que resultó negativa.

27. A las 4:00 p.m. de ese día su presión descendió a 100/70 y vomitó. Se le hicieron pruebas para considerar la posibilidad de una cetoacidosis diabética temprana, pero ante los resultados de acetona negativa, y Co2 de 28 se descartó esa posibilidad.

*1170
28.A las 12:00 de la medianoche su temperatura era de 40°C y presión de 90/70.

g. 17 de julio de 1986

29. En la mañana del 17 de julio de 1986, el paciente rejlejó que estaba ventilando fuerte con ruidos exteriores, su temperatura continuaba alta y la presión baja. La doctora que le atendió a esa hora opinó que el cuadro del paciente iba en resolución en vista de la disminución de leucocitos. Se continuó administrándole insulina y antibióticos.

30. A las 2:00 p.m. se le dio un baño de agua fría para controlar la fiebre. A las 4:00 p.m. rejlejó una disminución en la temperatura a 38.5°C, la prueba de acetona resultó negativa, presión continuaba en 90/60 y azúcar en 308 mg/dl.

31. En la medianoche del día 17, la temperatura había descendido a 38°C, la presión subió un poco, a 100/70 y la prueba de azúcar reflejó una disminución a 182 mg/dl.

h. 18 de julio de 1986

32. El 18 de julio de 1986 el Sr. Ortiz rejlejó un nivel de azúcar de 142 mg/dl, mostraba una dificultad respiratoria. Sus signos vitales a las 9:30 a.m. de temperatura de 38°C, presión de 100/70 y pulso de 86.

33. Ese día se recibieron los resultados de las muestras tomadas por el Dr. Santiago durante la operación, los que reflejaron la presencia de un crecimiento moderado de la bacteria estafilococus aureus en ambos pies. Se recomendó se le ofreciera terapia respiratoria en vista de los ronquidos.

34. A las 11:00 a.m. la prueba de azúcar rejlejó un nivel de 250 mg/dl.

35.Como a las 12:30 de la tarde el acompañante del paciente le indicó que éste se encontraba mal. Los signos vitales reflejaron una temperatura de 38. °C, pulso arrítmico de 63 y presión alterial de 80/50, con dificultad respiratoria aguda. Se ordenó prueba de gases alteriales y "monitoreo" cardíaco. Los resultados de laboratorio reflejaron una leve acidocis de 7.325 (los niveles normales son de 7.35 a 7.45) y una concentración de Co2 levemente baja de 33.7 mmhg (los niveles normales son de 35 a 45 mmhg). Se comenzó resucitación cardiopulmonar, se entubó al paciente y se le administró bicarbonato y epinefrina. El Sr. Ortiz no respondió al tratamiento que se le suministró por casi una hora para estabilizarlo, muriendo el 18 de julio de 1986 a la 1:45 p.m.

36.La Dra. Vidal se reunió con los familiares del paciente tras una reunión con los demás médicos, indicándoles que estimaba que la muerte había sido causada por una embolia pulmonar. Insatisfechos con dicha explicación y con el tratamiento otorgado al Sr. Ortiz González, los familiares solicitaron al Fiscal de Distrito que autorizara una autopsia privada.

i. 19 de julio de 1986

37.El 19 de julio de 1986 el Dr. José A. Carro Umpierre efectuó la autopsia determinando que la muerte se había causado por un edema del pulmón, condición que relacionó a un coma diabético. El patólogo no hizo pruebas para descartar la posibilidad de un "shock" séptico. El Dr. Carro declaró que el diagnóstico de coma diabético depende esencialmente del récord total del paciente y no depende de prueba patológica y que asoció el edema al coma diabético, porque según su experiencia es lo más usual. Por último indicó que llegó a esta conclusión aun cuando no tuvo el récord completo del paciente ante él y sin realizar prueba patológica alguna que confirmara su conclusión."
II
La controversia del caso ante nos estriba en la causa del fallo cardiovascular que ocasionó la muerte del Sr. Ortiz González. La teoría de la parte demandante es que el Sr. Ortiz González falleció ^o!Jo a un coma diabético, provocado por el manejo negligente de su condición de diabetes y de infección durante su hospitalización, provocando el desarrollo de una cetoacidosis diabética que a su vez ocasionó un coma diabético.
*1171 Por su parte, la parte demandada propuso que la muerte se causó por la posibilidad de un "shock" séptico, que es una complicación que consiste en una reacción tóxica provocada por sustancias químicas (toxinas) que entran en la corriente sanguínea y causan una reacción cuya causa y mecanismo de acción aún se desconocen, pero es esencialmente químico. Se caracteriza por fiebre alta, vómitos, diarrea, confusión, dolor de cabeza y letargo profundo. El síndrome puede progresar rápida y abruptamente y llevar a una disminución de la presión sanguínea, pérdida de la conciencia y a falla cardíaca debido a la insuficiencia en el fluido sanguíneo para sustentar la vida, (shock). Véase, The Merck Manual, supra, a las págs. 88-90. Los peritos de la parte demandada indicaron que no existe manera de tratar o prevenir el "shock" séptico, fuera de intentar combatir la infección original y cual en este caso estaba asociada a la presencia de la bacteria stafilococus aureus, la misma que fue encontrada en ambos pies del paciente. El perito de la parte demandada indicó que aun cuando los cultivos tomados al paciente no reflejaron la presencia de bacterias en el torrente sanguíneo, esto sería explicable debido a que en algunos casos el cultivo de sangre no sería positivo si estuvo en terapia previa de antibióticos.
El apelante argumenta en su escrito que conforme a la prueba presentada se debió concluir que el cuidado médico ofrecido al Sr. Ortiz en su segunda hospitalización fue negligente. Indica que esa negligencia es notable en varios episodios de la estadía del Sr. Ortiz en el hospital. Primero al trasladarlo del hospital sin regular las condiciones que le afectaban y sin conocer si éste podría ser atendido debidamente en el Hospital Psiquiátrico. Después, al Dr. Santiago no admitir bajo su cuidado al Sr. Ortiz cuando éste regresó al Hospital en Manatí, dejándolo al cuidado de unos médicos de familia que no estaban capacitados para atender la úlcera del pie. Indica además que la actuación negligente de la demandada continuó al hacer una operación con anestesia general sin el consentimiento específico para hacerlo y sin hacerse una evaluación preoperativa que determinara la condición del paciente. Por último argumentan que debido a la condición diabética y mental del paciente, se exigía de los demandados que cumplieran con un grado de atención y cuidado mayores.
Por último argumenta que reconocida por el Tribunal de Instancia la negligencia del Hospital Regional de Manatí y del Dr. Santiago en el tratamiento inicial otorgado al Sr. Ortiz González del 11 al 13 de julio, procedía declarar con lugar la demanda, pues se demostraron todos los elementos de una causa de daños y perjuicios. Indica que la falta de tratamiento adecuado a un diabético con infección y con diabetes descontrolada fue lo que causó que la infección degenerara en sepsis la cual, a su vez causó un desbalance que degeneró en cetoacidosis diabética y posteriormente en la muerte del paciente, o sea, que fue la inacción del Dr. Santiago y del Hospital la causa adecuada a la muerte de Ortiz González. i
Por su parte el E.L.A. argumenta que procede la confirmación de la sentencia apelada, ya que el apelante no demostró con preponderancia de prueba que el daño sufrido se debió con mayor probabilidad a la negligencia imputada; no pudiendo descansar en meras especulaciones o conjeturas de que el daño se debió al incumplimiento del médico de su obligación profesional.
Estudiada la posición de ambas partes, resolvemos.
ni
Los actos u omisiones ilícitas en que intervenga cualquier género de culpa o negligencia es una de las fuentes de las obligaciones nacidas del incumplimiento de obligaciones y deberes impuestos por la naturaleza y por la ley, necesarias para la armónica convivencia social. Ramos v. Orientalist Rattan Furnt., Inc., 131 D.P.R. _ (1992), 92 J.T.S. 74. El Artículo 1802 del Código Civil, supra, constituye una regla general que prohibe causar daño a otro mediante conducta activa o pasiva. Soc. de Gananciales v. González Padín, 117 D.P.R. 94 (1986).
Conforme a nuestro derecho, para que suija la obligación extracontractual de resarcir a una persona que ha sufrido un daño material o moral, deben concurrir tres requisitos: (1) la realidad del daño sufrido; (2) nexo causal entre el daño y la acción u omisión; y (3) que el acto u omisión sea culposo o negligente. Artículo 1802 del Código Civil, 31 L.P.R.A 5141; Bonilla v. Chardón, 118 D.P.R. 599 (1987).
Negligencia es descuido, omisión, falta de aplicación, Diccionario de La Lengua Española (Real *1172 Academia Española), 19na ed., Madrid, Ed. Espasa-Calpe,-1970. La negligencia es función de riesgos y surge del incumplimiento del deber de actuar con cuidado, estableciendo un riesgo de daños a otras personas. Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990); Sociedad v. González Padín, supra; Concepción Guzmán v. A.F.F., 92 D.P.R. 488 (1965); Pabón Escabí v. Axtmayer, 90 D.P.R. 20 (1964); Rodríguez Ramírez v. Franqui Viera, 86 D.P.R. 766 (1962); Alvarez v. Hernández, 74 D.P.R. 493 (1953); Jorge v. Umpierre, 49 D.P.R. 78 (1935).
En aquellos casos de alegada impericia médica al amparo del Artículo 1802 del Código Civil, supra, el médico u el hospital sólo, serán responsables, si ocurre un daño que en las circunstancias particulares del caso pudo razonablemente haberse previsto y evitado Núñez v. Cintrón, 115 D.P.R. 598 (1984). En casos de impericia médica, el Tribunal Supremo ha dispuesto específicamente que nuestro ordenamiento civil obliga al médico a responder por los daños y perjuicios causados a un paciente tan sólo cuando actúa negligentemente con descuido o falta de la pericia profesional que exigen las circunstancias. Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987). El cuidado médico exigible es aquel que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevaleciente de la medicina, satisface las exigencias .. generalmente reconocidas por la propia profesión médica. Ramos Robles v. García Vicario, 136 D.P.R. _ (1993), 93 J.T.S. 167; Castro Ortiz v. Municipio de Carolina, 136 D.P.R. _ (1994), 94 J.T.S. 17. En los casos en que se alegue la impericia médica, se presume que el médico ejerció un grado razonable de cuidado al paciente; por lo tanto, corresponde al demandante, rebatir esa presunción a favor del médico. Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988); Ramos Robles v. García, supra.
Para determinar si un acto u omisión fue o no la causa próxima o. eficiente de unos daños, hay que ver si el acto u omisión aparece como consecuencia razonable y. ordinaria del daño. Estremera v. Inmobiliaria, supra. Es decir, si ese acto regularmente produce ese resultado. Arroyo López v. E.L.A., 126 D.P.R. 682 (1990).
La doctrina de causalidad adecuada ha sido adoptada en nuestra jurisdicción para determinar si la ocurrencia del daño era de esperarse en el curso normal de los acontecimientos o sea, aquella condición que ordinariamente produce ese daño. Miranda v. E.L.A., 139 D.P.R. _ (1994), 94 J.T.S. 152; Cárdenas Maxán v. Rodríguez Rodríguez, 125 D.P.R. 702 (1990); Jiménez v. Pelegrina, supra. El principio de causalidad requiere que en todo caso de daños y perjuicios el demandante pruebe que la negligencia del demandado fue la que con mayor probabilidad causó el daño sufrido.
Es norma reiterada que un tribunal apelativo no intervendrá con la apreciación de la prueba en ausencia de pasión, prejuicio, parcialidad o error manifiesto, o a menos que un análisis integral de la prueba así lo requiera, esto ya que el juzgador de instancia está en mejor posición al evaluar la prueba. Pueblo v. Maisonave Rodríguez, 129 D.P.R. _ (1991), 91 J.T.S. 67.
Como excepción a la norma anterior, un tribunal apelativo está en libertad de adoptar su propio criterio al evaluar la prueba pericial y documental, quedando en igual posición que los tribunales de instancia. El foro apelativo no está obligado a seguir la opinión, juicio, conclusión o determinación de un perito o facultativo. Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989).
Tal y como indicáramos anteriormente habiendo examinando el legajo ante nos, encontramos que la sentencia recoge de manera detallada toda la prueba vertida en el juicio, a la que hemos añadido algunos datos en el resumen que de la misma se hace, específicamente en cuanto a que no fue hasta la madrugada del 13 de julio, que se le administró por primera vez un antibiótico, al Sr. Ortiz González, aun cuando el tratamiento adecuadado es de administrar antibióticos desde el principio. Igualmente incluimos que el Hospital Psiquiátrico al referir al paciente al Centro Médico solicitó que se le evaluara ante la posibilidad de una cetoacidosis diabética y para que se descartara la posibilidad de sepsis. Por último, determinamos que conforme a la prueba vertida, no fue hasta el 13 de julio de 1986 que a las 2:45 p.m. que se le administró insulina y que entonces el Doctor Laureano observó que el paciente sufría de una "tremenda infección ”.
Coincidimos con el ilustrado Tribunal de Instancia en que nos encontramos ante un caso en que el récord médico y la autopsia practicada a Ortiz González lo que arrojan es incertidumbre sobre la *1173 verdadera causa de la muerte de éste.
En la causa ante nos, la parte demandante-apelante demostró la realidad del daño sufrido, que fue la muerte del Sr. Ortiz González. Además probó que tanto el Hospital Alejandro Otero López (HAOL) como el Dr. Santiago fueron negligentes al tratar inicialmente al Sr. Ortiz González del 11 al 13 de julio, específicamente al no proveerle insulina, antibióticos, ni curar su herida desde un principio y al trasladarlo del hospital sin antes estabilizarlo y sin tomar las medidas adecuadas para su tratamiento. Sin embargo, entendemos que dicha situación fue corregida oportunamente por el Dr. Laureano en el Hospital Universitario. Aun cuando existen incidentes que señalan la negligencia en el tratamiento inicial dado al paciente, no encontramos en el expediente que ninguno de estos incidentes hayan sido los causantes del daño.
El Sr. Ortiz González llegó por primera vez al HAOL el 11 de julio de 1986, a las 4:30 p.m., no se le pudo administrar los antibióticos ordenados hasta varias horas después debido a que éste se arrancaba el suero del brazo y se mostraba agresivo. A partir del 13 de julio de 1986 recibió el tratamiento adecuado para las condiciones que fue reflejando, a través de hidratación, antibióticos, insulina y calmantes para estabilizar su condición mental. El expediente médico del Sr. Ortiz González refleja que aun cuando sus niveles de glucosa seguían variando, los mismos habían bajado, al igual que la fiebre.
No hallamos en el récord prueba de que la muerte de Ortiz González se debió a la omisión de otorgarle tratamiento médico adecuado los días 11 y 12 de julio. Transcurrieron más de cinco días desde que se comenzó el tratamiento en los niveles de glucosa en el cuerpo, de células blancas y en la temperatura del paciente. Coincidimos con el Tribunal de Instancia en que la prueba vertida por las partes demostró que el tratamiento dado al Sr. Ortiz González del 13 al 18 de julio fue adecuado y que los errores iniciales en su tratamiento no afectaron el desenlace final, porque el paciente recibió el único tratamiento que era posible para sus condiciones. La parte demandante-apelante no puso en condiciones al Tribunal de entender cómo la dilación en el tratamiento del paciente del 11 al 12 de julio, fue el factor que precipitó la muerte seis días más tarde. Igualmente no se demostró que la intervención quirúrgica efectuada por el Dr. Santiago haya sido negligente o que la anestesia general estuviera contraindicada.
De conformidad a nuestras determinaciones anteriores, concluimos que el tratamiento otorgado al Sr. Ortiz González después del 13 de julio de 1986 fue el adecuado, y que la dilación en recibir tratamiento no fue el factor que con mayor probabilidad ocasionó su muerte.
DICTAMEN
Por los fundamentos anteriormente relatados, confirmamos el dictamen de instancia desestimando la demanda.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 98 DTA 106
1. La diabetes mellitus es un desorden endocrino, caracterizado por la hiperglicemia (niveles altos de glucosa) que resultan de una deficiencia en la producción de insulina. La insuficiencia de insulina ocasiona que no puede utilizarse el azúcar para nutrir las células del cuerpo, lo que conlleva a que se utilicen las grasas del metabolismo, alterando otros órganos del cuerpo. La existencia de una deficiencia de insulina tiene un efecto inmuno-depresor sobre las defensas del cuerpo, ya que afecta la circulación del paciente, por lo que una lesión sencilla al cuerpo tiene el potencial de complicarse.
2. La cetoacidosis es un desbalance electrolítico generalizado, inducido por el aumento en concentración de cuerpos cetónicos y de ácidos. Al generalizarse el efecto del desbalance metabólico inicial y variarse el PH del *1174 cuerpo, se afectan todos los órganos y sistemas. La cetoacidosis diabética se produce por la deficiencia en los niveles de insulina y azúcar en el cuerpo, usualmente es precipitada por un lapso en el tratamiento de insulina, por una infección aguda o traumas. Sus síntomas iniciales son polyuria (aumento en el alto volumen de orina a más de 2,500 mi diarios), náuses, vómitos, y en casos somnolencia y letargo. Muestra además signos de deshidratación, hipotensión (tensión baja de la sangre en el aparato circulatorio), y en algunos casos un patrón de respiración lenta y profunda, y un olor a acetona que se podría detectar en el aliento. Su diagnóstico dependerá de que se encuentren niveles altos de azúcar en la sangre (usualmente de 400 a 800 mg/dl, pero puede ser menor), sodio alto, potasio bajo, acidosis metabólica (una disminución en el fluido extracelular de concentraciones de bicarbonato en que el PH y el HC03 de la sangre se reduce. Los niveles normales de PH son de 7.34 a 7.30 y de HC03 es de 21-28 mEg/L ). El tratamiento recomendado incluye la hidratación para estabilizar la circulación y mantener la adecuada producción de orina; administración intravenosa de insulina regularmente en dosis adecuadas, prevención de hypokalemia (reducción niveles de potasio a menos de 3.5 Eg/L). durante el tratamiento e identificación de cualquier infección bacteriana asociada. Véase The Merck Manual of Diagnosis and Therapy, 16th Edition, Rahway, NJ. Merck Sharp & Dohme Research Laboratories, 1992, alapág. 1122-1123.