ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| ANA LÓPEZ PRIETO<br><br>Parte Apelada<br><br>v.<br><br>MANUEL CORREA MÁRQUEZ<br><br>Parte Apelante | KLAN202301056 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Caso Núm.:<br>D CD2014-2084<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Adames Soto, la Juez Aldebol Mora y el Juez Campos Pérez.[1]

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de abril de 2024.

Comparece la parte apelante, el Lcdo. Manuel Correa Márquez (licenciado Correa Márquez), y nos solicita la revocación de la *Sentencia* emitida el 24 de octubre de 2023, notificada el día 26 siguiente, por el Tribunal de Primera Instancia, Sala de Bayamón (TPI). En el referido dictamen, el TPI declaró *Ha Lugar* la *Demanda* por cobro de dinero, instada por la parte apelada, Lcda. Ana López Prieto (licenciada López Prieto). En consecuencia, condenó al apelante a pagar la suma adeudada de $75,955.20 por concepto de los honorarios de la representación legal prestada por la apelada.

Por los fundamentos que expondremos, confirmamos el dictamen impugnado.

**I.**

La causa presente se inició el 4 de agosto de 2014, ocasión en que la licenciada López Prieto presentó una *Demanda* por cobro de dinero contra el licenciado Correa Márquez.[2] Alegó que el

---

[1] El Hon. José I. Campos Pérez sustituyó al Hon. Abelardo Bermúdez Torres, por virtud de la Orden Administrativa TA-2023-212, emitida el 6 de diciembre de 2023.
[2] Apéndice, págs. 1-4, anejos a las págs. 5-13.

demandado contrató sus servicios de representación legal en un caso de divorcio por trato cruel: *Manuel Correa Márquez v. Carmen Milagros Juliá Rodríguez,* KDI 2009-0289. Explicó que, entre las partes, se pactó un contrato verbal, del cual aún el licenciado Correa Márquez adeudaba una cuantía ascendente a $84,561.45. La demandante unió a su reclamación una tabla en la que desglosó las partidas de su acreencia, de las que restó algunos descuentos y acreditó el pago realizado por el demandado de $20,400.00. La licenciada López Prieto solicitó, además, honorarios por concepto de temeridad, al tener que recurrir al proceso judicial, luego que el licenciado Correa Márquez no contestó la oferta de transacción cursada el 25 de junio de 2013.

El demandado presentó *Contestación a Demanda* el 6 de noviembre de 2014.[3] En esencia, aceptó que la licenciada López Prieto lo representó en el pleito de familia, no obstante, negó adeudar cantidad alguna por dichos servicios. Reconoció por igual el recibo de la oferta para transigir la deuda y rechazó la temeridad imputada. En su defensa, expresó que la cantidad reclamada no cumplía con los criterios éticos establecidos por el Tribunal Supremo de Puerto Rico, en cuanto a los contratos de servicios legales.

Así las cosas, el 9 de diciembre de 2015, los litigantes presentaron conjuntamente el *Informe de conferencia con antelación al juicio.*[4] Del documento surge que las partes estipularon la carta de oferta de transacción de 25 de junio de 2013, 27 facturas fechadas entre 2009 y 2014; y 15 cheques fechados entre 2009 y 2013, así como un abono en efectivo realizado en el 2010, mediante los cuales el licenciado Correa Márquez pagó a la demandante una suma total de $20,400.

---

[3] Apéndice, págs. 16-19.
[4] Apéndice, págs. 20-43.

La vista en sus méritos se celebró los días 13 de noviembre de 2018; 20 y 21 de febrero de 2019. Por la parte demandante testificaron la licenciada López Prieto, la Lcda. Maribel Rivera Monzón, quien también representó al demandado en el pleito de familia, y la Sra. Petra Ramos Flores, secretaria de la demandante. Por la parte demandada, declaró el licenciado Correa Márquez.

En cuanto a la prueba documental, la demandante ofreció la prueba estipulada.[5] Por su parte, el demandado ofreció y el TPI admitió como evidencia siete legajos del caso KDI 2009-0289 (Exhibits 1-7) con una selección de los documentos judiciales del pleito de familia;[6] así como una lista de señalamientos y escritos presentados entre el 19 de febrero de 2009 y el 18 de septiembre de 2014 en el caso KDI 2009-0289 (Exhibit 8) y una carta de 10 de diciembre de 2012, suscrita por la demandante, en la que anunció al demandado que el término para satisfacer una factura era de 15 días, a partir de su emisión, y el cobro de intereses a razón de 4% (Exhibit 9).

Justipreciada la prueba testifical y documental, el 26 de octubre de 2023, el TPI notificó la *Sentencia* aquí impugnada.[7] En ésta determinó que la licenciada López Prieto rindió servicios legales por 762.95 horas en un periodo de cuatro años y validó las facturas remitidas al licenciado Correa Márquez. No obstante, de los $84,561.45 restó cuatro partidas ascendentes a $8,606.25. En consecuencia, condenó al demandado a pagar la suma de $75,955.20. No conteste con la determinación judicial, el 27 de noviembre de 2023, el apelante acudió ante este foro revisor y planteó los siguientes señalamientos de error:

> **PRIMER ERROR:** Cometió error el Tribunal de Primera Instancia al declarar Ha Lugar la demanda en cobro de honorarios de abogado y ordenar al apelante a

---

[5] Véase, Autos Originales, *Prueba Estipulada.* Exhibit 1 carta de 25 de junio de 2013; Exhibit 2A-2AA facturas; Exhibit 3A-3Ñ cheques.
[6] Refiérase al Apéndice, págs. 35-43.
[7] Apéndice, págs. 78; 79-93.

satisfacer la suma de $75,955.20 adicionales a los $20,400.00 ya satisfechos por éste, luego de descontar la cantidad de $8,606.25 que correspondían a unas partidas facturadas por la demandante-apelada por servicios que no fueron prestados.

**SEGUNDO ERROR:** La decisión del foro de instancia es ajena a los principios éticos que rigen el contrato de servicios profesionales de abogado, en particular los de honradez y honestidad, ya que no consideró que la prueba estableció que la apelada, en contravención a dichas normas: facturó servicios que no fueron prestados por ella, incluso, antes de que asumiera la representación legal del apelante; facturó la preparación de dos recursos al Tribunal de Apelaciones que fueron desestimados por incumplimiento con las disposiciones que rigen la presentación de recursos y falta de diligencia; incurrió en el cobro de honorarios excesivos, irrazonables y exorbitantes; realizó ajustes a las facturas para incluir horas adicionales sin explicar la naturaleza o propósito del ajuste; facturó trabajos secretariales cobrando su tarifa; y varió unilateralmente los términos del contrato de servicios.

**TERCER ERROR:** Incidió la Sala de Instancia al no resolver que los honorarios de abogado facturados por la apelada eran irrazonables, excesivos y onerosos y denegar la solicitud del apelante con respecto a que era de aplicación la doctrina de *quantum meruit* y a base de la misma eran razonables los pagos realizados por él por la suma de $20,400.00.

La parte apelada presentó su alegato el 16 de febrero de 2024. Con el beneficio de ambas comparecencias, los Autos Originales, incluyendo la prueba documental admitida, y la transcripción de la prueba oral, estamos en disposición de resolver.

**II.**

**A.**

Un contrato existe cuando concurren tres requisitos, a saber: (1) el consentimiento de los contratantes; (2) un objeto cierto y (3) causa para la obligación. Art. 1213 del Código Civil de 1930, 31 LPRA ant. sec. 3391.[8] La autonomía de la voluntad es uno de los

---

[8] Mediante la Ley Núm. 55-2020 se aprobó el Código Civil de 2020. No obstante, los hechos del caso tienen su génesis en momentos previos a la vigencia del nuevo cuerpo procesal, por lo que procede la aplicación de las disposiciones del derogado Código Civil de 1930. Al respecto, el Artículo 1812 del Código Civil de 2020, que versa sobre los actos y contratos celebrados bajo el Código Civil de 1930, dispone, en parte, lo siguiente: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código [...]". 31 LPRA sec. 11717.

principios cardinales que rigen las relaciones contractuales en nuestro ordenamiento. Este principio concede a los contratantes la libertad de "establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil de 1930, 31 LPRA ant. sec. 3372. En cuanto al contrato de servicios legales, éste se considera una variante del contrato de arrendamiento de servicios del Artículo 1434 del Código Civil de 1930, 31 LPRA ant. sec. 4013; *In re: Rodríguez Mercado*, 165 DPR 630, 641 (2005). No obstante, el Tribunal Supremo de Puerto Rico ha reiterado insistentemente que es un contrato *sui generis*, "revestido de las consideraciones éticas que regulan la profesión legal". *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 270 (2021), que cita a *In re Vélez Lugo*, 180 DPR 987 (2011); *López de Victoria v. Rodríguez*, 113 DPR 265 (1982); Canon 24 del Código de Ética Profesional, 4 LPRA Ap. IX. Ahora, **el abogado o abogada que presta sus servicios tiene derecho a recibir una compensación razonable por éstos**. *Cruz Pérez v. Roldán Rodríguez et al.*, *supra*, pág. 271; *Pérez v. Col. Cirujanos Dentistas de P.R.*, 131 DPR 545, 558 (1992).

De otro lado, el precepto legal *quantum meruit* significa "tanto como se merece". I. Rivera García, *Diccionario de Términos Jurídicos*, 3ra ed. rev., San Juan, Ed. Lexis, 2000, pág. 395, citado en *Blanco Matos v. Colón Mulero*, 200 DPR 398, 412 (2018). En esencia, la doctrina reconoce el derecho que tiene toda persona a reclamar el valor razonable de los servicios que ha prestado. *Id.*; *Pérez v. Col. Cirujanos Dentistas de P.R.*, *supra*; págs. 557-558. La acción para reclamar el valor razonable de servicios prestados, a base de esta doctrina emana del Artículo 1473 del Código Civil de 1930, el cual dispone, en parte, que "**[e]n cuanto a los servicios profesionales, se estará, para la remuneración de los mismos, a lo convenido entre las partes**; cuando no hubiere convenio y surgieren

diferencias, la parte con derecho a la remuneración podrá reclamar y obtener en juicio de la otra parte, ante cualquier corte de jurisdicción competente, el importe razonable de dichos servicios". 31 LPRA ant. sec. 4111; *Pérez v. Col. Cirujanos Dentistas de P.R.*, *supra*, págs. 557-558. Es decir, en aras de evitar el enriquecimiento injusto, la disposición citada provee un remedio en restitución basado en elementos de justicia y permite la posibilidad de reclamar el valor razonable **cuando no se hubiera pactado un precio cierto**. *Blanco Matos v. Colón Mulero, supra*, pág. 413. Así, pues, de ordinario, un abogado o una abogada "puede reclamar compensación por los servicios que ha prestado a base de un *quantum meruit* **cuando no exista un pacto expreso de honorarios** [...]". *Id.*, que cita a *Pérez v. Col. Cirujanos Dentistas de P.R., supra*, pág. 561; *Colón v. All Amer. Life & Cas. Co.*, 110 DPR 772, 777 (1981). Por el contrario, "**cuando exista un pacto de honorarios, independientemente de su naturaleza, de ordinario, aplica el principio de *pacta sunt servanda* por lo que el abogado no tiene derecho a reclamar a base de un *quantum meruit*"**. (Énfasis nuestro). *Blanco Matos v. Colón Mulero, supra*; Arts. 1044 y 1473 del Código Civil de 1930, 31 LPRA ants. secs. 2994, 4111. Como se sabe, el principio contractual de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias necesarias derivadas de la buena fe. *BPPR v. Sucn. Talavera*, 174 DPR 286, 693 (2008). Es sabido que la buena fe obliga más allá de lo expresamente pactado, para abarcar "todas las consecuencias" que por la naturaleza del contrato "sean conforme a la buena fe, al uso y a la ley". *Id.*; Art. 1210 del Código Civil de 1930, 31 LPRA ant. sec. 3375.

**B.**

El Tribunal Supremo de Puerto Rico ha expresado que, en nuestro sistema de justicia, la discreción judicial permea la

evaluación de la evidencia presentada en los casos y controversias. *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011); *Pueblo v. Miranda Ortiz,* 117 DPR 188, 191 (1986). Por ello, es norma firme que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, la apreciación de la prueba realizada por el Tribunal de Primera Instancia merece deferencia y respeto por parte de los foros apelativos. *González Hernández v. González Hernández, supra; Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013); *Argüello v. Argüello,* 155 DPR 62, 79 (2001); *Trinidad v. Chade,* 153 DPR 280, 291 (2000). En la revisión de un dictamen en el que desfiló prueba testifical, este tribunal revisor debe conferir la debida deferencia a la apreciación de los hechos efectuada por el juzgador, por ser éste el más idóneo para llevar a cabo esa función. *McConnell v. Palau,* 161 DPR 734, 750 (2004). En suma, "[l]a determinación de credibilidad del tribunal sentenciador "es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987), citado en *Argüello v. Argüello, supra,* pág. 79. Ello así, porque **sólo el juez o la jueza de primera instancia tiene la oportunidad de ver al testigo declarar, escuchar su testimonio vivo y evaluar su demeanor**. *Sepúlveda v. Depto. de Salud,* 145 DPR 560, 573 (1998); *Ramos Acosta v. Caparra Dairy, Inc.,* 113 DPR 357, 365 (1982). Además, la Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110, dispone que un testigo que merezca entero crédito al Tribunal de Primera Instancia es prueba suficiente de cualquier hecho. Por lo anterior, el Tribunal Supremo ha resuelto que la apreciación de la prueba y la credibilidad de los testigos que realice el Tribunal de Primera Instancia no deben ser sustituidas por las del Tribunal de Apelaciones. *Rolón García y otros v. Charlie Car*

*Rental, Inc.*, 148 DPR 420, 433 (1999). Únicamente, cuando del examen de la prueba se desprenda que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios improbables o imposibles es que se ha justificado nuestra intervención con la apreciación de la prueba realizada por el tribunal *a quo. C. Brewer P.R., Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). En esos casos, estamos autorizados a intervenir, ya que la apreciación de la prueba oral se distancia de los hechos o los testimonios son inherentemente imposibles o increíbles. *Pueblo v. Soto González*, 149 DPR 30, 37 (1999).

Claro está, a pesar de la norma de deferencia judicial, la máxima curia ha indicado que, cuando las conclusiones de hecho del foro de instancia estén basadas en prueba pericial o documental, los tribunales revisores nos encontramos en la misma posición que el foro impugnado. *González Hernández v. González Hernández, supra*, pág. 777. Por lo tanto, este tribunal intermedio está facultado para adoptar un criterio propio en la apreciación y evaluación de la prueba documental o pericial. *Mun. de Loíza v. Sucns. Suárez et al.*, 154 DPR 333, 363 (2001); *Prieto v. Maryland Casualty Co.*, 98 DPR 594, 623 (1970). En consecuencia, en el caso de un conflicto irreconciliable entre la prueba testifical y la prueba documental, aquellas determinaciones de hecho basadas en estas últimas pueden ser alteradas. *Díaz García v. Aponte Aponte*, 125 DPR 1, 13-14 (1989).

**III.**

En el caso de autos la parte apelante plantea que el TPI incidió al conceder la reclamación de la licenciada López Prieto y ordenar el pago de $75,955.20 adicionales a los $20,400.00 pagados. Alega que la determinación judicial es ajena a los principios éticos que rigen el contrato de servicios profesionales de los abogados, en referencia a la honradez y honestidad. En particular, arguye que no se

consideraron servicios que no fueron prestados o prestados sin obrar diligencia en alusión a los recursos apelativos desestimados, el alegado cobro de honorarios irrazonables, que incluyeron gestiones secretariales, y la presunta enmienda unilateral del contrato de servicios, que redujo el plazo para pagar y pautó el cobro de intereses. También aduce que, a base de la doctrina de *quantum meruit*, la suma satisfecha ascendente a $20,4000 es razonable.

A continuación, resumimos las declaraciones de los testigos que el TPI escuchó y apreció, a los que hemos impartido énfasis.

**Lcda. Ana López Prieto**

La apelada comenzó su práctica legal en 1984[9] y ha concentrado el ejercicio de la profesión en el derecho de familia.[10] Durante cuatro años, entre 2009 a 2013, representó al apelante en un caso de divorcio, alimento de menores, alimento entre parientes y pensión de excónyuge.[11] **Indicó que ambos pactaron un contrato verbal de honorarios; a saber: $175 la hora en oficina y $225 la hora en tribunal, sin incluir los gastos del litigio, los cuales debería sufragar el apelante**.[12] La licenciada López Prieto no solicitó ningún tipo de adelanto al licenciado Correa Márquez. En general, emitía las facturas cada dos meses y el apelante hacía abonos. Aseguró que el apelante le expresó que pagaría las facturas.[13] En múltiples ocasiones, **la licenciada López Prieto aplicó "descuentos de cortesía" a la deuda del apelante**.[14] Estos fluctuaban entre 33% o menos.[15] No obstante, sostuvo que éste llegó a acumular una deuda de $84,561.45.[16]

---

[9] Transcripción de la prueba oral (TPO) de **13 de noviembre de 2018**, pág. 10 líneas 17-18.
[10] *Id.*, pág. 11 líneas 1-2.
[11] *Id.*, pág. 11 líneas 6-17.
[12] *Id.*, págs. 12-13.
[13] *Id.*, págs. 14 líneas 10-11; 16 líneas 14-23.
[14] *Id.*, pág. 17 líneas 9-11.
[15] TPO de **20 de febrero de 2019**, pág. 60 líneas 5-14.
[16] TPO de **13 de noviembre de 2018**, pág. 36 líneas 16-22.

En el turno de contrainterrogatorio, la licenciada López Prieto negó haber variado el acuerdo verbal. No obstante, admitió el envío de una misiva de 10 de diciembre de 2012, dirigida a sus deudores, incluyendo al apelante, en la que indicó que el término para satisfacer la factura era de 15 días y la generación de intereses a razón de 4%.[17]

En lo que atañe al caso del epígrafe, la apelada testificó que **ella realizó el trabajo de ciertas mociones suscritas por la licenciada Rivera Monzón**, por lo que facturó al apelante por dicha labor.[18] Asimismo, en cuanto a los recursos de *certiorari* presentados ante este foro y los cuales fueron desestimados por falta de jurisdicción,[19] en el turno de redirecto, **la licenciada López Prieto aseguró que el licenciado Correa Márquez sabía que estaban fuera de término, pero consintió su radicación**.[20]

En general, la representación legal del apelante inquirió sobre las ejecutorias de la licenciada López Prieto a base de los documentos del caso KDI 2009-0289, las horas o fracciones de hora consignadas en las facturas y los montos cobrados, con el propósito de minar la procedencia de la suma reclamada en la *Demanda*. No obstante, la apelada fue enfática al expresar al abogado del apelante acerca de **los documentos admitidos del caso KDI 2009-0289**, los cuales "**no son los únicos documentos del caso**, porque tiene ocho (8) legajos",[21] por lo que **no representan la totalidad de la labor realizada**.

En suma, la apelada declaró que, aun cuando el divorcio fue un proceso rápido, el resto de **las controversias del pleito de familia tornaron el caso en uno "intenso" y "difícil"**, con más de

---

[17] *Id.*, págs. 40 líneas 3-9; 51 líneas 1-14.
[18] *Id.*, págs. 52-57.
[19] *Id.*, págs. 60-63; 84-88. Refiérase a, KLCE200901432; KLEM201000017; KLCE201000872.
[20] TPO de **20 de febrero de 2019**, pág. 61 líneas 3-24.
[21] Énfasis nuestro. *Id.*, pág. 64 líneas 5-6.

150 horas de vistas ante el tribunal.[22] Por igual, acotó que **el apelante nunca mostró reparos sobre la facturación ni solicitó descuentos adicionales.**[23] Incluso, el 25 de junio de 2013, le cursó al licenciado Correa Márquez una **oferta de transacción para zanjar la deuda por un pago de $50,000**[24] pero éste no contestó la comunicación.[25]

**Lcda. Maribel Rivera Monzón**

La licenciada Rivera Monzón se unió a la representación legal del apelante en 2009, a la que renunció en 2013.[26] Ésta **trabajaba con la apelada, quien le pagaba mensualmente por sus servicios**, aunque reconoció que el licenciado Correa Márquez le pagó honorarios directamente.[27] Describió el procedimiento como "angustioso y tedioso"[28] e incluso "horrible"[29] debido a unas alegadas irregularidades del proceso ante la examinadora de pensiones alimentarias. Por ejemplo, indicó que los procedimientos nunca se grabaron y las determinaciones no eran cónsonas con el ordenamiento vigente.[30] Afirmó que **el apelante** era muy exigente y, por lo general, **participaba en el proceso de preparación de las vistas**. También se unía **el perito del caso**. Añadió que él estaba frustrado con el desarrollo del procedimiento en el tribunal.[31] "Bueno, estaba molesto con la Juez, con la examinadora, con la licenciada, con la otra abogada, sobre todo con la exesposa, con los hijos, con todo el mundo".[32] La testigo declaró que **el caso**

---

[22] TPO de **13 de noviembre de 2018**, pág. 15 líneas 1-16.
[23] TPO de **20 de febrero de 2019**, pág. 62 líneas 1-9.
[24] TPO de **13 de noviembre de 2018**, pág. 72 líneas 8-20; TPO de 20 de febrero de 2019, págs. 32-33.
[25] TPO de **20 de febrero de 2019**, págs. 60 líneas 18-24; 61 líneas 1-2.
[26] *Id.*, pág. 80 líneas 15-24.
[27] *Id.*, págs. 77-78; 91.
[28] *Id.*, pág. 82 líneas 5-6.
[29] *Id.*, pág. 84 líneas 18-19.
[30] *Id.*, pág. 82 líneas 10-21; véase, además, págs. 83-84.
[31] *Id.*, págs. 85 líneas 10-18; 86 líneas 13-20.
[32] *Id.*, pág. 89 líneas 19-22.

**conllevaba una dedicación de tiempo excesiva y extraordinaria**, ya que la dinámica del procedimiento "no era normal".[33]

**Sra. Petra Socorro Ramos Flores**

La testigo fungió como secretaria legal de la apelada por 15 años.[34] Como parte de sus deberes se encontraba realizar la hoja de trabajo de la factura, cuyo proceso explicó en sala.

P.     ¿Para esos años, dos mil nueve (2009) al dos mil trece (2013), puede explicarle a su Señoría cuál era el proceso que usted seguía para preparar la facturación?

R.     Sí, llevábamos una hoja de trabajo. Y digo "llevábamos", porque yo **tomaba nota todos los días del trabajo que se hacía, además la licenciada López Prieto también, de todos los casos**. Por ejemplo, la fecha, el nombre del cliente y qué se hizo, una moción y demás. **En base a eso yo hacía la factura** y a las notas que me daba la licenciada y era un mes sí, un mes no, comenzando en enero quince (15) del año, de comenzar el año.

Es decir, **se hacían seis (6) facturas al año. Comenzaba en enero y terminaba el quince (15) de noviembre. Un mes sí, un mes no.** Que era el acuerdo que se hizo en el contrato de servicios profesionales.

P.     ¿Y quién hacía la entrada de la data en la computadora que entonces se reflejaba ya en la facturación...

R.     Yo.[35]

.     .     .     .     .     .     .     .

P.     ¿Cómo era que se retabulaban o se registraban los pagos recibidos como parte del proceso de facturación?

R.     Bueno, yo tenía una carpeta donde ponía la factura y las tenía en orden alfabético con los nombres de los clientes y cada vez que algún cliente hacía un pago, yo se lo registraba. Si era en cheque le sacaba copia del cheque y lo ponía detrás de esa factura y le hacía la deducción. Si eran... si debía seis mil (6,000) y abonó dos mil (2,000), pues naturalmente, le quedaba un balance de cuatro mil (4,000), que ese balance era

---

[33] *Id.*, pág. 90.
[34] *Id.*, págs. 112-113.
[35] *Id.*, págs. 114 líneas 13-24; 115 líneas 1-9.

el que yo iba a coger cuando fuera a hacer la nueva factura. ¿Ve? Ese es el...[36]

.        .        .        .        .        .        .        .

P.      ¿Quién era responsable de registrar el tiempo, cuánto tiempo se dedicaba para cada una de las tareas que aparecen reflejadas en todas esas facturas que usted tiene ante sí?

R.      Bueno, la licenciada, porque ella era... ella era la que me decía, por ejemplo, una moción se ve quizás de tres (3), cuatro (4) páginas, pero ella hizo *research*, o sea, buscó información para preparar la moción y claro, ya una moción sencilla de informativa, de una paginita pues yo le decía: "Licenciada, ¿cuánto es? —Punto veinticinco (.25)" generalmente. Las demás que eran de mucho tiempo ella me decía el tiempo.

P.      ¿Y en término de las conversaciones telefónicas, por ejemplo, llamadas telefónicas, cómo se llevaba el tiempo de las llamadas telefónicas?

R.      Pues yo las registraba por fecha y generalmente, cuando eran dos (2) y tres (3), pues le ponía punto veinticinco (.25), por ejemplo. Si eran llamadas extensas donde la licenciada le tenía que contestar algunas preguntas y demás, pues ella me decía el tiempo.

P.      Y término de reuniones con... ya fuera con el licenciado [ininteligible] o Correa Márquez o con algún perito o con las otras partes...

R.      Sí.

P.      ...¿cómo se llevaba ese tiempo, cómo se registraba?

R.      Bueno, una vez entraban, empezaba la reunión, yo 1o anotaba en mi hoja. Después, cuando salían, lo anotaba y lo consultaba con la licenciada. Muchas veces ella me decía: "Descuéntale media (½) hora. Descuéntale veinte (20) minutos", así. Y si era cuestión de una (1) hora o hora y media (1 ½), pues se la dejamos completa.

P.      **Y en muchas de esas facturas, al final, hay un descuento de cortesía.**

R.      **Sí.**

P.      ¿Eso quién decidió dar ese descuento?

R.      La Licenciada me decía: "Dale un descuento, porque la factura está un poco alta". A pesar de que, verdad, trabajo que se hizo, pero por

---

[36] *Id.*, págs. 117 líneas 16-24; 118 líneas 1-4.

consideración a él, pues le... ella me decía que le diera... que le hiciera un descuento de equis cantidad. Digo, yo por cuenta mía no lo iba a hacer.[37]

La señora Ramos Flores agregó que la factura se entregaba a la licenciada López Prieto para su revisión y se remitía al cliente. A preguntas de la representación legal de la apelada, **la testigo reconoció al apelante, de quien indicó le enviaba la correspondencia a un apartado en San Juan, incluyendo la facturación**.[38] Testimonió que éste **nunca le mencionó nada relacionado con la facturación**.[39] Tampoco sobre la apelada. "No, no. A mí no me hizo comentario adverso, negativo respecto a... ni a la licenciada ni al caso, ninguno".[40]

### Lcdo. Manuel Correa Márquez

El apelante **corroboró** que la apelada lo **representó entre los años 2009 y 2013**; así como los **términos de la contratación** con respecto a los **honorarios y los gastos**.[41] Ahora, declaró que, en febrero, marzo o abril de 2010, conversó por teléfono con la licenciada López Prieto acerca de la "exorbitante" facturación, que casi igualaban su ingreso bruto mensual de $11,000.[42] Manifestó que la apelada le indicó que no se preocupara, que **cuando el pleito finalizara acordarían unos honorarios razonables, los cuales sufragaría con la venta de la casa**.[43] Así, pues, le sorprendió recibir la misiva de 10 de diciembre de 2012, en la que se estableció el término de 15 días para pagar las deudas y la generación del 4% de interés. El testigo dijo que llamó a la apelada, pero no se llegó a ningún acuerdo.[44] Aun cuando insistió que el acuerdo inicial se modificó para establecer honorarios razonables y proporcionales,

---

[37] *Id.*, págs. 119 líneas 19-24; 120; 121 líneas 1-14.
[38] *Id.*, págs. 115-116; 118.
[39] *Id.*, pág. 119.
[40] *Id.*, pág. 122 líneas 4-6.
[41] TPO de **21 de febrero de 2019**, págs. 135 líneas 17-24; 136 líneas 1-11.
[42] *Id.*, pág. 136 líneas 14-24.
[43] *Id.*, pág. 137 líneas 1-12.
[44] *Id.*, pág. 138.

**reconoció que continuaba recibiendo las facturas, las cuales archivaba**.[45] Apostilló que el monto reclamado por la apelada era irrazonable, ya que **el divorcio fue rápido y no había cuestiones noveles**.[46] Con relación a la licenciada Rivera Monzón, declaró que la contrató en marzo de 2009 y le pagó $2,000.[47] En cuanto a la **oferta de transacción** de la licenciada López Prieto, el apelante admitió su recibo: "Ella ofrece, hace una oferta".[48] Sin embargo, éste **no contestó la carta ni aceptó transigir**: "No, yo no la acepté. (…) No contesté."[49]

Con relación a los honorarios pactados, el apelante sostuvo que el acuerdo verbal se modificó.

P.    Y como usted entendió el acuerdo de honorarios es, que la licenciada le cobraría a usted a ciento setenticinco dólares ($175) por hora en todo trabajo hecho fuera del tribunal, ¿correcto?

R.    Inicialmente, así fue.

P.    Y doscientos veinticinco dólares ($225) la hora por comparecencias al tribunal.

R.    Inicialmente, así fue.

P.    Y usted entendía que eso iba a generar una factura como las que usted comenzó a recibir, en el sentido de que...

R.    Iba a generar una factura, sí.

P.    Una factura que detallara fecha, tarea realizada y tiempo invertido en cada tarea.

R.    Iba a generar una factura, sí.

P.    Y entonces usted señala que... ¿En qué fecha es que usted celebró esa conversación telefónica con la licenciada?

R.    Eso fue alrededor de febrero, marzo, abril. A principios de dos mil diez (2010). Yo la llamé.

P.    ¿Y según usted dice el acuerdo es que cuando se acabara el caso se iban a sentar a resolver cuánto le iba a pagar usted?

---

[45] *Id.*, págs. 139 líneas 18-24; 140 líneas 1-2.
[46] *Id.*, pág. 140.
[47] *Id.*, págs. 142 líneas 16-24; 143 líneas 1-2.
[48] *Id.*, págs. 144 línea 23; 155 líneas 1-4.
[49] *Id.*, págs. 146 líneas 23-24; 147, líneas 1-17.

R.  **Nos íbamos a sentar a determinar la razonabilidad del caso**. Las facturas... Lo que discutimos en la conversación fue que esas facturas no había Dios que la aguantara por la razón sencilla de que en noviembre ya habían [*sic*] once mil, (11,000) pesos "factura'os" y yo me ganaba once mil ([$]11,000) pesos mensuales. Y a eso había que quitarle los cuatro mil diecisiete (4,017) que pagaba de alimentos, tenía que quitarle el IRS, Hacienda, más los que me quitaban de la oficina. Licenciado, yo vivía con trescientos ([$]300) pesos al mes.

El primer año, dos mil nueve (2009) debía diez mil ([$]10,000) pesos de *income tax* y Hacienda, y cinco mil (5,000) de IRS. Quince mil dólares ($15,000), porque no había con qué pagar.

P.  Y luego de esa conversación usted recibió... siguió recibiendo facturas.

R.  Sí [ininteligible] la factura, correcto.

P.  **Y no hay una sola carta suya a la licenciada objetando las facturas, ¿correcto?**

R.  **No hay ninguna carta mía, igual que no hubo ningún acuerdo original, por escrito. Así mismito es.**

P.  **Y usted hacía abonos periódicos.**

R.  **Según yo podía, en mi condición, hacía los abonos periódicos, correcto,** porque tenía...

P.  Y ninguno de los cheques contenía anotación alguna a los efectos de que usted estaba pagando bajo protesta o con reserva de derecho, ¿correcto?

R.  Decía... Ya eso lo habíamos acordado. Se decía "abono". Yo las facturas las cogía y las archivaba porque habíamos "cuadra'o" lo que íbamos a hacer con la [inaudible].

P.  O sea, en entonces usted recibía las facturas y las miraba, le pregunto.

R.  Yo las recibía o mi secretaria las recibía. Yo las ponía allí.

P.  La pregunta es si las miraba cuando las recibía.

R.  Bueno, me imagino que algunas las miré, sí.

P.  O sea, que lo razonable es pensar —y le pregunto— que usted las recibía y miraba: "Mira, caramba, la verdad que Ana sigue invirtiendo un montón de tiempo en el caso". ¿Usted nunca... no vio eso en la factura?

R.     Nosotros íbamos a sentarnos a ver la razonabilidad de esto y la…

P.     Esa no fue mi pregunta. Mi pregunta es si cuando usted recibía las facturas usted miraba cuánto tiempo Ana seguía invirtiendo en el caso.

R.     Alguna de las que miraba, sí, lo miraba.

P.     ¿Y no volvió a llamar usted a la licenciada López Prieto para decirle: "Mira, Ana, tú sigues facturándome todo eso. Acuérdate que tenemos este acuerdo"? ¿Usted nunca tuvo esa otra [llamada]?[50]

R.     Nosotros después, licenciado…

P.     ¿Verdad que no?

R.     …nosotros nos reunimos después en su oficina y volvimos a hablar del acuerdo este a que llegamos.

P.     ¿Cuándo?

R.     En posterioridad al primer acuerdo.

P.     ¿Cuándo?

R.     No me acuerdo. Tiene que ser con posterioridad.

P.     O sea…

R.     Y después de eso…

P.     Perdóneme, perdóneme, pero vamos a ser…. vamos a tratar de precisar. Porque ella fue abogada suya cuatro (4) años, ¿verdad? ¿Sí?

R.     Desde julio.

P.     **¿Fue abogada cuatro (4) años?**

R.     **Desde julio del dos mil nueve (2009) hasta agosto del dos mil trece (2013)**

P.     Cuatro (4) años, ¿sí?

R.     Sí, ahí tiene la fecha.

P.     Y ya, más o menos, nos puso la primera conversación esa para principios del dos mil diez 2010. No sabemos si fue febrero o marzo, abril.

R.     Por ahí fue.

P.     ¿Pudo haber sido mayo dos mil diez (2010)?

---

[50] Véase, *Moción consignando enmiendas a la transcripción de la prueba* de 8 de enero de 2024.

R.   No, mayo sería la segunda en su oficina.

P.   ¡Ah! Por eso.

R.   Por ahí, más o menos.

P.   O sea, que hubo una primera conversación por teléfono y luego una conversación en la oficina.

R.   De ella, personalmente, correcto.

P.   Pero entonces fueron relativamente cerca una a la otra, ¿cierto?

R.   Bueno, eso lo dice usted. Yo digo, pues, un mes, dos (2) ...

P.   No, pero es lo que usted me...

R.   Un mes después, más o menos.

P.   Eso es lo que usted me acaba de decir.

R.   Como un mes después, licenciado.

P.   **Pero después de mayo del dos mil diez (2010) usted recibió facturas, usted recibía facturas cada dos (2) o tres (3) meses, ¿correcto?**

R.   **Sí, venían facturas.**

P.   Y seguía registrándose una cantidad de tiempo sustancial.

R.   **Licenciado, yo no miraba todas las facturas porque ya el acuerdo estaba hecho. Yo las recibía y la guardaba allí**.

P.   Y entonces...

R.   **No tenía por qué mirarlas, porque yo sabía... ya habíamos cuadrado cómo íbamos a bregar con el caso de la facturación y de dónde venían los chavos.**

P.   Y tampoco tuvo usted nunca una conversación con la licenciada López Prieto diciéndole: "Mira, Ana, tú me sigues mandando "to'" esas facturas, si yo no tengo por qué recibir más facturas si tenemos un acuerdo distinto".

R.   Ella la...

P.   ¿Verdad que usted no tuvo esa conversación con ella?

R    **No, ella la estaría mandando porque ella quisiera mandarla**.

P.   **Que si usted tuvo esa conversación con ella, es mi pregunta**.

R.    **No**.

P.    ¿Perdón?

R.    No.

P.    Y lo cierto es que el Derecho de Familia no es lo suyo, usted...

R.    ¿Cómo?

P.    Que los Derechos de Familia no es a lo que usted se dedica.

R.    No.

P.    **Y lo cierto es que usted entiende que una abogada de la experiencia de la licenciada López Prieto, que cobre ciento setenticinco dólares ($175) por hora es razonable**.

R.    **Eso es razonable**.

P.    ¿Perdón?

R.    Podría ser razonable.

P.    Que si es razonable.

R.    Podría ser razonable, sí.

P.    **Y lo cierto es que hubo muchísimas vistas.**

R.    **Sí.**

P.    **Y hubo muchísimas reuniones de preparación en las que usted participó.**

R.    **Sí.**

P.    ¿Perdón?

R.    Sí.

P.    Y eran reuniones de más de una (1) hora usualmente.

R.    Algunas, algunas.

P.    **Y además de eso, usted había contratado a un perito.**

R.    **Sí.**

P.    ¿Correcto? Y usted fue el que escogió el perito ¿correcto?

R.     Sí.[51]

El licenciado Correa Márquez testificó que acordó con la licenciada López Prieto que, una vez establecieran el monto de los honorarios, los pagaría cuando se vendiera el inmueble de la comunidad postganancial. No obstante, el apelante enunció que la apelada renunció y las partes no discutieron la razonabilidad de los honorarios y por eso la disputa se sometió a la consideración del foro judicial.[52] Ahora, **el apelante admitió que después de vender la residencia, no se comunicó con la apelada para satisfacer los honorarios pendientes de pago**.[53]

Asimismo, el apelante declaró que, después de la renuncia de la licenciada López Prieto, el caso continuó hasta los foros apelativos.[54] Incluso, a la fecha de su testimonio en 2019, el caso de familia KDI 2009-0289 no había culminado.[55] Igualmente, aseveró que le pagaba a razón de $175 por hora a la abogada que continúa atendiendo el pleito familiar, tarifa que estimó como una razonable.[56] De hecho, en sala reprodujeron un ejercicio matemático realizado durante la deposición del testigo en el que, a base de las horas trabajadas por la licenciada López Prieto y el abono de $20,400 pagado por el apelante, los honorarios resultarían en una tarifa por hora irrisoria que el licenciado Correa Márquez no halló razonable.[57]

Por su intrínseca relación, discutiremos en conjunto la trilogía de señalamientos de error. De entrada, el examen de la prueba documental y testifical nos lleva a colegir que el licenciado Correa

---

[51] TPO de **21 de febrero de 2019**, págs. 150 líneas 16-24; 151-157; 158 líneas 1-2.
[52] *Id.*, págs. 159-160.
[53] *Id.*, pág. 173 líneas 1-7.
[54] Véase, *Correa Márquez v. Juliá Rodríguez*, 198 DPR 315 (2017), que revocó el KLAN201500499; además, KLAN201300835 consolidado con KLCE201301035; KLAN201500277; KLAN201500278; KLCE201900713; KLCE201901476; KLCE201901560; KLCE202000024; KLAN202100254; KLCE202100531; KLCE202300127.
[55] TPO de **21 de febrero de 2019**, págs. 161-163.
[56] *Id.*, pág. 164.
[57] *Id.*, págs. 170-172.

Márquez no demostró que el TPI incidiera en su apreciación y, por ende, al resolver la procedencia de la reclamación por servicios legales prestados. Decididamente, nuestra intervención no se justifica. Adviértase que el TPI escuchó los testimonios vertidos, a los que adjudicó credibilidad, y realizó un minucioso análisis de las facturas emitidas, así como de la muestra seleccionada del trabajo realizado por la licenciada López Prieto, que el apelante ofreció en evidencia. El TPI concluyó que la apelada rindió un total de **762.95 horas en un periodo de cuatro años**. La tarifa pactada verbalmente por los honorarios fue de **$175 la hora de servicios y $225 la hora por la comparecencia a las vistas del caso**.

Al tiempo del juicio que nos ocupa —cuando el caso KDI 2009-0289 todavía seguía pendiente por la multiplicidad de pensiones alimentarias y controversias que convergieron— el apelante declaró que le pagaba a su actual representación legal honorarios por $175 la hora y aseveró sobre su razonabilidad. Nótese también que la licenciada Rivera Monzón testimonió que el proceso fue inusual y atribuyó a que la examinadora de alimentos que atendió el proceso de fijación de las distintas pensiones no se ceñía al derecho vigente y permitía la relitigación de las mismas controversias. Ésta testificó, además, que se celebraron muchas vistas, las cuales conllevaron diversas reuniones de preparación, en las que el apelante, al igual que el perito contratado por éste, también participó. Así lo reconoció el propio apelante.

Además, es indiscutible que las facturas con actualizaciones del balance pendiente de pago, como explicó la señora Ramos Flores, fueron enviadas al apelante en intervalos de meses alternos al tiempo de prestarse los servicios legales y éste no las protestó de manera oportuna. Si bien el licenciado Correa Márquez declaró que conversó con la apelada para realizar ajustes al total, es indisputable que la licenciada López Prieto adjudicó descuentos de

cortesía. Además, el apelante admitió que habían acordado que con la venta de la propiedad satisfaría la deuda, pero éste ni siquiera se comunicó con la apelada cuando dicha venta se concretó. Tampoco contestó la oferta de transacción cursada por la apelada.

Con relación a los señalamientos específicos que apuntó el licenciado Correa Márquez en su recurso, éstos no nos persuaden para variar la determinación judicial impugnada. Se presentó prueba testifical no controvertida que demostró que los escritos judiciales suscritos por la licenciada Rivera Monzón, quien trabajó en la oficina de la licenciada López Prieto, fueron preparados por la apelada. Es decir, aquí no se trata de una doble facturación. En cuanto al asunto de los dos *certiorari* desestimados, vimos que el apelante no controvirtió las declaraciones de la apelada en torno a que él conocía las circunstancias que anticipaban la desestimación de los recursos y consintió su presentación. Acerca de los cuestionamientos sobre el tiempo invertido en determinadas gestiones, más allá de las apreciaciones del apelante en una práctica del Derecho que admitió desconocer, el expediente está huérfano de evidencia que contravenga las correspondientes partidas en las facturas. Por ejemplo, la licenciada López Prieto acotó, y la evidencia así lo demuestra, que los dos informes de conferencia con antelación al juicio, presentados en 2010 (23 páginas)[58] y 2011 (61 páginas),[59] no eran iguales. La apelada explicó que, debido al cambio de circunstancias familiares, en particular, hijos que advinieron a la mayoría y solicitaron alimentos entre parientes, comparecieron nuevos abogados y variaron los criterios para imponer los alimentos reclamados.[60] Asimismo, las partidas por gestiones que el apelante imputa como de índole secretarial son inconsecuentes en

---

[58] Exhibit 4 de la parte demandada y apelante.
[59] Exhibit 5 de la parte demandada y apelante.
[60] TPO de **20 de febrero de 2019**, págs. 55-57.

comparación a los descuentos por cortesía recibidos. Además, el TPI pasó juicio sobre todas las facturas y descontó $8,606.25. Por último, independientemente de la misiva de 10 de diciembre de 2012, la cuantía ordenada a pagar por el TPI no contempló el cálculo por la imposición de 4% de intereses, según esgrimidos por la apelada en la aludida carta.

Finalmente, la pretensión del apelante de dar por satisfecha la deuda a base de los abonos efectuados de $20,400 resulta insostenible, pues la tarifa por hora de la apelada se reduciría unilateralmente a $26.74. La matemática es objetiva, al adicionar la suma condenada de $75,955.20 al abono de $20,400 el resultado es $96,355.20; por consiguiente, el licenciado Correa Márquez pagaría los honorarios de las 762.95 horas trabajadas por la licenciada López Prieto a razón de $126.29 en lugar de los $175 y $225 pactados. Según expusimos, el precepto de *quantum meruit* aplica en aquellos casos en que no existe un pacto o, bajo ciertas circunstancias, en un acuerdo de honorarios contingentes. En este caso, los contratantes, ambos abogados, pactaron verbalmente una tarifa específica por hora. Obligación que los vincula y debe cumplirse al tenor de lo acordado. No guardamos duda de que la licenciada López Prieto, sobre quien descansó el peso de la prueba, demostró la existencia de un acuerdo verbal con el licenciado Correa Márquez por tarifas razonables y probó también las gestiones profesionales realizadas a beneficio del apelante, así como el tiempo dedicado a éstas. A esos efectos, el apelante está compelido a cumplir con los acuerdos dinerarios a los que se obligó. Por tanto, concluimos que el TPI no cometió los errores imputados. En ausencia de error, pasión, prejuicio o parcialidad, no se amerita nuestra intervención con el dictamen.

## IV.

Por los fundamentos expuestos, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


                              Lcda. Lilia M. Oquendo Solís
                          Secretaria del Tribunal de Apelaciones